**Jimmie Louise STOTT, Plaintiff,**

v.

**BUNGE CORPORATION and Beatrice Company, as the successor to Esmark, Inc. Defendants.**

**No. CIV 1–92–0028.**

United States District Court, E.D. Tennessee, at Chattanooga.

Aug. 7, 1992.

O. Michael Carter, Lusk, Carter & McGhehey, Chattanooga, Tenn., for plaintiff.

Richard J. McAfee, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga, Tenn., for Bunge Corp.

William G. Colvin, Shumacker & Thompson, Chattanooga, Tenn., Beatrice Co.

### CORRECTED MEMORANDUM AND ORDER

JORDAN, District Judge.

This civil action is before the Court for consideration of the report and recommendation filed by United States Magistrate Judge Robert P. Murrian on June 8, 1992 [doc. 14]. No party has filed an objection to this report and recommendation, and enough time has passed since the filing of the report and recommendation to treat any objections to it as having been waived. The Court, upon a *de novo* review of the case, finds that Magistrate Judge Murrian's report and recommendation states correct findings and conclusions. The Court therefore ACCEPTS this report and recommendation under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b).

For the reasons stated in Magistrate Judge Murrian's report and recommendation, which the Court adopts as its ruling in this case, the Court finds the motion for summary judgment filed by the defendant Bunge Corporation [doc. 3] well taken, and it is GRANTED. The plaintiff's claim that this moving defendant is obligated to disburse immediately to the plaintiff 50% of Thomas Calvin Stott's retirement benefits as of December 31, 1989 is DISMISSED.

The Court finds the plaintiff's motion for summary judgment [doc. 9] not well taken, and it is DENIED.

It is ORDERED that this civil action is SET FOR A STATUS CONFERENCE on Friday, August 28, 1992, at 1:30 p.m., in Knoxville. Counsel should be prepared to discuss whether the plaintiff will prosecute this civil action, and, if so, the scheduling of it for trial.

### REPORT AND RECOMMENDATION

ROBERT P. MURRIAN, United States Magistrate Judge.

This case is before the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b), Federal Rules of Civil Procedure, for a report and recommendation regarding disposition by the District Court of the motions for summary judgment filed by defendant, Bunge Corporation ("Bunge"), [Doc. 3] and by plaintiff, Jimmie Louis Stott, [Doc. 9] [*see* Doc. 7].

This is an action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* The case was initiated in the Circuit Court of Hamilton County, Tennessee by the plaintiff, Jimmie Louis Stott, alleging that the Circuit Court of Hamilton County had entered a Final Decree of Divorce containing a Qualified Domestic Relations Order ("QDRO") pertaining to certain retirement benefits which Thomas Calvin Stott, Jr., has in the Bunge pension plan and Beatrice Retirement Income Plan ("Beatrice") as the successor to Esmark, Inc. Pension Plan for Salaried Employees (hereinafter referred to collectively as "the Plans"); that the Final

Decree of Divorce ordered that Jimmie Louis Stott be paid fifty percent (50%) of the benefits to which Thomas Calvin Stott is entitled under the Plans as of December 31, 1989, with such funds to be distributed to her as quickly as administratively possible; that the Plans have failed and refused to abide by the terms of the QDRO and have refused to disburse these funds; that the Plans are not even processing plaintiff's claims despite demand having been made upon them to comply with the QDRO; and that she is entitled to immediate disbursement of fifty percent (50%) of Thomas Stott's retirement benefits as of December 31, 1989, and her reasonable attorney's fees [*see* Doc. 1]. On January 17, 1992, this cause was removed to Federal Court pursuant to 28 U.S.C. § 1441(b) and 29 U.S.C. § 1132 [Doc. 2].

Defendant Bunge moves the court for an order granting summary judgment in its favor [Doc. 3]. All parties agree that the question presented by this case is one of law and that there are no material issues of fact in question [Doc. 10]. The following procedural history and statement of facts are not in dispute, *id.:*

On November 16, 1990, the Circuit Court of Hamilton County entered a final decree of divorce (the "Divorce Decree") granting Plaintiff a divorce from her husband Defendant Thomas Calvin Stott, Jr. Paragraph nine (9) of the Divorce Decree orders the allocation of Defendant Stott's pension benefits in [the Plans] between Plaintiff and her ex-husband. The pertinent parts of that paragraph read as follows:

Plaintiff is hereby given judgment against Defendant Thomas Calvin Stott, Jr. for fifty percent (50%) of those funds [Bunge and Esmark funds] as of December 31, 1989, which represents one-half (½) the amount of the husband's interest in those pension funds during the term of the parties' marriage. To effectuate the Plaintiff wife's collection of the judgment amounts, the Court orders as follows:

(a) *Application of Retirement Equity Act of 1984*—The Court determines that pursuant to the Retirement Equity Act of 1984 ... fifty percent (50%) of Thomas Calvin Stott, Jr.'s retirement benefits under the Bunge Corporation Pension Plan ... and fifty percent (50%) of Thomas Calvin Stott, Jr.'s retirement benefits under the Esmark, Inc. Pension Plan ... *shall be distributed and disbursed to Jimmie Louise Stott pursuant to this Order as soon as administratively possible in the form provided in such respective plan.*

. . . . .

(e) *Bunge Corporation Pension Plan* ... Such benefits shall be distributed to Jimmie Louise Stott as quickly as administratively possible. The distribution to Jimmie Louise Stott shall be in a *lump sum payment or other form as provided in the Bunge Plan.*

. . . . .

(g) This Qualified Domestic Relations Order does not require either the Bunge Plan or the Esmark Plan to provide any type or form of benefit not otherwise provided under the Bunge Plan or the Esmark Plan.

. . . . .

(Emphasis added).

Following the entry of the Divorce Decree, representatives of the Bunge Corporation sought to negotiate with Plaintiff in order to rephrase the Divorce Decree to meet ERISA, IRC and Plan requirements....

Defendant, Thomas Calvin Stott, Jr. is 42 years of age,.... His service with Bunge Corporation began on January 28, 1990.... Under the Bunge Plan requirements, at the time of the Divorce Decree and even at the present time, the "earliest retirement age" for Defendant Stott is 65 years of age.... Therefore, Defendant Stott is not entitled to any distribution under the Plan until he reaches the age of 65.... Additionally, under the terms of the Plan, lump sum payments are only to be made to participants whose employment has terminated and whose actuarial equivalent projected

retirement income is less than $3,500.00.... Defendant Stott is not entitled to a lump sum payment under the Plan.

[Doc. 4, pp. 1–4].

The defendant contends, *inter alia,* that the Divorce Decree is not a QDRO as that term is defined in ERISA; that although a domestic relations order may still be "qualified" even though it provides for payment to an alternate payee before a participant has separated from service, *see* 29 U.S.C. § 1056(d)(3)(E)(i)(I), that payment cannot be made until the date the participant obtains "earliest retirement age"; that 29 U.S.C. § 1056(d)(3)(E)(i)(II) and (III) allow a domestic relations order to be a "qualified domestic relations order" even if it treats the participant as having retired on the date on which payment is to begin, but the payment may only be in a form allowed under the plan and must be reduced to present value; that under the terms of the Plan, Defendant Stott's earliest retirement age is 65 and he is not eligible for a lump-sum payment; that plaintiff is asking this court to write an exception into the statute which is not in the statute and is prohibited by the statute; that the provisions of the Divorce Decree itself weigh in favor of defendants' position in that the Divorce Decree indicates that the state court was not requiring a lump sum payment if such a payment would be in contravention of the terms of the Plan [Doc. 4].

The plaintiff responded to the defendants' motion for summary judgment with a counter motion for summary judgment, contending that the sole question in this case is whether the case of *Custer v. Custer,* 776 S.W.2d 92 (Tenn.App.1988), is valid and binding upon this court in this case [Doc. 8].

ERISA was enacted for the purpose of protecting and ensuring " 'the continued well-being and security of millions of employees and their dependents' who rely upon retirement plans." *Ablamis v. Roper,* 937 F.2d 1450, 1453 (9th Cir.1991). Thus, ERISA contains a "spendthrift provision" or "anti-alienation clause" which provides that

[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

29 U.S.C. § 1056(d)(1). ERISA did not, however, clearly set forth the rights of a spouse in an employee's pension benefits which, as a result of the spendthrift provision, often left women who had significantly contributed to the family's home and financial security unable to obtain any pension benefits upon divorce or the death or a husband. *See Ablamis, id.* As a result, the Retirement Equity Act of 1984 ("REA") was passed in an effort to "safeguard the financial security of widows and divorcees." *Ablamis, id.* The United States Supreme Court has held that

[t]o protect [the] ... interests [of widows and divorcees], the REA creates an express statutory exception to the prohibition on assignment and alienation in the case of distributions made pursuant to certain state court orders: ERISA's spendthrift provisions are not applicable to a "qualified domestic relations order" (QDRO).

*Ablamis,* 937 F.2d at 1454 (citing *Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990)).

Specifically, 29 U.S.C. § 1056(d)(3)(A) provides that

Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

A "domestic relations order" is

any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii)(I) and (II). A "qualified domestic relations order" is a domestic relations order

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met,....

29 U.S.C. § 1056(d)(3)(C) provides that

[a] domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(D) explains that

[a] domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

A domestic relations order cannot be found to require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan in violation of 29 U.S.C. § 1056(d)(3)(E)(i)

solely because such order requires that payment of benefits be made to an alternate payee—

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age;

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

Finally,

[f]or purposes of this subparagraph, the term "earliest retirement age" means the earlier of—

(I) the date on which the participant is entitled to a distribution under the plan, or

(II) the later of the date of [sic] the participant attains age 50 or the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.

29 U.S.C. § 1056(d)(3)(E)(ii)(I) and (II).

■ There is apparently no dispute that the Divorce Decree at issue in this case is a "domestic relations order" as defined in 29 U.S.C. § 1056(d)(3)(B)(ii)(I) and (II); and that it satisfies all of the statutory requirements for a QDRO with the exception of § 1056(d)(3)(D)(i), which provides that the QDRO may not "require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan...." Thus, the real question before the court is whether the Divorce Decree's requirement that 50% of Mr. Stott's pension benefits be "distributed and disbursed to Jimmie Louise Stott ... as soon as administratively possible in the form provided in such

respective plan[s]", *see* Doc. 4, *i.e.*, immediately, but before Mr. Stott reaches his "earliest retirement age" as defined by 29 U.S.C. § 1056(d)(3)(E)(ii), is tantamount to requiring the plan to provide a benefit or option not otherwise provided under the plan, *see* 29 U.S.C. § 1056(d)(3)(D)(i), thereby removing the Divorce Decree from the definition of a *qualified* domestic relations order, 29 U.S.C. § 1056(d)(3)(B)(i)(II). If the subject Divorce Decree is not a qualified domestic relations order, then it is subject to the spendthrift provision of 29 U.S.C. § 1056(d)(1). 29 U.S.C. § 1056(d)(3)(A).

■ 29 U.S.C. § 1144(a) provides that [e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title....

Thus, as a general rule in cases involving claims under ERISA, state law claims, including claims for improper processing of benefits claims, are preempted by ERISA. *See Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 62–63, 107 S.Ct. 1542, 1545–46, 95 L.Ed.2d 55 (1987), as cited in *Carland v. Metropolitan Life Insurance Co.*, 935 F.2d 1114, 1118 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991). 29 U.S.C. § 1144(b)(7) explains, however, that "[s]ubsection (a) shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title)." Accordingly, it has been held that

[t]aken together, sections 1144(b)(7) and 1056(d)(3)(B)(i) of the statute exempt divorce decrees meeting the statutory requirements from ERISA preemption. The general goals of ERISA are served by this interpretation of the preemption exception because a divorce decree meeting the requirements contained in section 1056(d) provides all the necessary information to determine the identity of a beneficiary without creating unreasonable administrative burdens for the plan administrator.

*Carland*, 935 F.2d at 1120. *See also Ablamis v. Roper*, 937 F.2d 1450, 1454–55 (9th Cir.1991) (court held that "in the case of QDROs the REA provides a 'limited exception' to the anti-assignment provision for certain specified types of domestic relations property allocations. Because orders providing for such allocations are not subject to the anti-assignment provision, no preemption issue arises as to them."); *Custer v. Custer*, 776 S.W.2d 92 (Tenn.App. 1988), *appeal denied*, (1989), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). The Tennessee Court of Appeals in *Custer, supra*, a case almost identical to the case *sub judice*, held that "disbursement of retirement plan funds to a nonparticipant spouse in compliance with a QDRO is not contingent upon the age of the participant spouse at the time the funds are to be distributed[;] [and that] [s]ince the Custers' divorce decree is a "Qualified Domestic Relations Order" as defined by ERISA in 29 U.S.C. § 1056(d)(3), the wife may receive the fund awarded to her by the court's decree "as if the participant [the husband] had retired on the date on which such payment is to begin." *Custer*, 776 S.W.2d at 95. It is the plaintiff's position that the holding in *Custer* controls this case because questions relating to the "QDRO" in this case are not preempted, but are instead governed by Tennessee law. The key to drafting a divorce decree which constitutes a QDRO and escapes ERISA preemption, however, is drafting a decree that meets *all* of the ERISA statutory requirements for such an order. Whether all statutory requirements have been met is a question of *federal* law, as opposed to state law. Only if it is determined that the divorce decree in this case meets all the *federal* statutory requirements for a QDRO, does the court turn to state law to answer questions regarding the terms of the decree itself. *See Carland*, 935 F.2d at 1120. *See also Custer*, 776 S.W.2d at 95 (quoting a portion of the legislative history of the Retirement Equity Act of 1985, Senate Report, S.Rep. No. 575, 98th Cong., 2d Sess. (1984), reprinted in

1984 U.S.Code Cong. & Admin.News 2547, 2565, the Tennessee court recognized that " 'the assignment of [an] alternate payee's rights to the benefits is not considered an assignment or alienation of benefits under the plan *if and only if the order is a qualified domestic relations order,' and the state law providing these rights under a QDRO would be exempt from federal pre-emption* [ (emphasis added) ]."

For the reasons indicated more fully below, it is the undersigned's opinion that the Divorce Decree in this case is *not* a QDRO because it violates 29 U.S.C. § 1056(d)(3)(D)(i), in that it requires the defendant plans to provide an "[a] type or form of benefit, or [an] option [for obtaining benefits], not otherwise provided under the plan." *Id.* Research efforts have failed to uncover any reported federal case on point with the case currently before me. The plain statutory language, several law review articles, and one ALR annotation, however, have provided guidance to the court's understanding of this complex statutory scheme.

As indicated, the plaintiff relies upon *Custer, supra,* which, in turn, relies *solely* upon 29 U.S.C. § 1056(d)(3)(E)(i)(II) to find that the divorce decree at issue did not require the defendant plan to "provide any type or form of benefit, or any option, not otherwise provided under the plan," 29 U.S.C. § 1056(d)(3)(D)(i). In *Custer, supra,* the parties were divorced in July, 1987 and the divorce decree provided in pertinent part the following:

(a) Application of Retirement Equity Act of 1984. The Court determines that pursuant to the Retirement Equity Act of 1984 (Act) Public Law 98–397, Section 204, $11,236.55 of Kenneth Wayne Custer's retirement benefits under the Southern Electrical Retirement fund may be disbursed and distributed to Sylvia Angela Custer pursuant to this order as soon as administratively possible in the form provided in such respective plan.

(b) Effective Date. This order is entered as a Qualified Domestic Relations Order, as that term is used in the Act.

*Custer,* 776 S.W.2d at 95. The defendant Fund refused to disburse the money to Ms. Custer and she filed a petition to show cause. The Fund argued that ERISA prohibited distribution of Fund proceeds in that, although Congress created an exception to the spendthrift provision for QDRO's, a plan participant could not receive any benefits until age 55 under the plan; therefore, the earliest date for an effective QDRO, and the earliest date on which Ms. Custer could receive her share of her husband's pension benefits would be Mr. Custer's 55th birthday. Mr. Custer was 32 years of age at the time of the decision in *Custer v. Custer, supra.* In support of its argument the Fund relied upon the definition of "earliest retirement age" found at 29 U.S.C. § 1056(d)(3)(E)(ii). The Court of Appeals of Tennessee, Eastern Section, held that although the Divorce Decree ordered payment of retirement benefits prior to the participant spouse's attainment of his "earliest retirement age",

the Act specifically provides that if an order requires payment of benefits to an alternate payee "as if the participant had retired on the date on which such payment is to begin under the order," it would meet the requirements of that clause[;]

*Custer,* 776 S.W.2d at 95; and that, therefore, the divorce decree complied in every respect with ERISA's requirements for a QDRO, *id.*

It is clear from the foregoing that the Tennessee Court recognized that a divorce decree which required a pension plan to disburse a portion of an employee spouse's pension benefits before the employee reached his retirement age was tantamount to requiring the plan to provide a type or form of benefit, or option, not otherwise provided under the plan, · 29 U.S.C. § 1056(d)(3)(D)(i); and that absent an exception or exclusion such as that provided in 29 U.S.C. § 1056(d)(3)(E)(i), the divorce decree would not constitute a QDRO. Once a court is aware of a possible violation of 29 U.S.C. § 1056(d)(3)(D)(i), it must examine 29 U.S.C. § 1056(d)(3)(E)(i) to determine whether the potential reasons for a finding of subparagraph (D)(i) violation,

have been statutorily excluded and whether there is or is not in fact a violation of 29 U.S.C. § 1056(d)(3)(D)(i). Upon examination of 29 U.S.C. § 1056(d)(3)(E)(i), I find that the statute clearly indicates that *all three* conditions set forth in subparagraph (E) must be present before an order requiring payment of benefits to an alternate payee "as if the participant had retired on the date on which such payment is to begin" can be held not to violate the requirement of 29 U.S.C. § 1056(d)(3)(D)(i). In other words, 29 U.S.C. § 1056(d)(3)(E)(i) provides, *inter alia*, that

> A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee—
>
> (I) in the case of any payment before a participant has separated from service, *on or after the date on which the participant attains (or would have attained) the earliest retirement age,*
>
> (II) ..., *and*
>
> (III) .... [ (emphasis added) ].

Use of the word "and" is all inclusive. The conditions of subparagraph (E)(i)(I), (II), and (III) are not separate alternatives. Rather, *each* condition must be met. Several law review articles discussing the Retirement Equity Act of 1984 and its amendments to ERISA have indicated that payment to the alternate payee can only be required *after* the participant spouse reaches his or her earliest retirement age. *See* Elizabeth Beskin, Comment, *Retirement Equity Inaction: Division of Pension Benefits Upon Divorce in Louisiana,* 48 La.L.Rev. 677, 684 (1988) ("REA's QDRO provisions specifically provide for payment of a pension benefit to an ex-spouse (alternate payee) before the participant elects to retire, *but 'on or after the date on which the participant attains ... earliest retirement age.'* (footnote omitted). Such required payment before the participant would elect to receive retirement benefits himself does not run afoul of REA's proscriptions. Although a QDRO cannot require a plan 'to provide any type or form of benefit, or any option, not otherwise provided under the plan ... [or] to provide increased benefits,' (footnote omitted) a QDRO can require benefits to be paid to an alternate payee at the earliest date on which the participant could retire and receive a benefit [ (emphasis added) ]"); Anne Moss, *Women's Pension Reform: Congress Inches Toward Equity,* 19 U.Mich. J.L.Ref. 165, 169–170 (1985) ("Divorced spouses likewise receive new protection under REA. A spouse who has been awarded a share of the worker's pension at the time of divorce may collect her share directly from the pension plan, if the court issues what REA calls a 'qualified domestic relations order,' an order containing certain specific information about the amount to be paid (footnote omitted).... The new divorce provisions go beyond mere clarification, however, and allow greater flexibility for payment to the former spouse. The qualified order may be written to permit the former spouse to receive her share in any form provided by the plan, such as a lump sum or a monthly annuity payable over her lifetime (footnote omitted). *The share may be paid as soon as the worker reaches the earliest retirement age under his plan* [ (emphases added) ]."); Louise E. Graham, *The Kentucky Law Survey: Domestic Relations,* 73 Ky.L.J. 379, 383 n. 29 (1984) (citing legislative history of the REA, 1984 U.S.Code Cong. & Ad.News 2566, and discussing QDRO's and their restrictions, article states that "[t]hese restrictions do not prevent trial courts from requiring payment to the alternative payee *once the participant achieves his or her earliest retirement age without regard to whether the participant actually retires* [ (emphasis added) ].") Similarly, in an American Law Reports annotation, Gavin L. Phillips, J.D., explains that

> [a] qualified domestic relations order may provide that payments to the alternate payee begin on or after the date on which the participant attains the earliest retirement age under the plan as if the participant had retired on the date on which the payment was to begin under the order. (footnote omitted) For purposes of this provision, the term "earliest

retirement age" means the earlier of: (1) the date on which the participant is entitled to a distribution under the plan, or (2) the later of: (a) the date on which the participant attains age 50, or (b) the earliest date on which the participant could begin receiving benefits under the plan if he separates from service (footnote omitted). Thus, an order directing the payment of a terminated participant's pension benefit to an alternate payee will not be a qualified domestic relations order where the order requires the plan to pay out the amounts to the alternate payee before the participant has satisfied the criteria for a distribution of benefits under the terms of the plan, because the order requires the plan to provide a form of benefit or an option not otherwise provided under the plan. (footnote omitted) However, one state court has construed the language of this provision of ERISA to permit the payment of a portion of a participant's benefit under a pension plan to an alternate payee at the time directed by the order as if the participant had retired on the date on which payment is directed by the order without regard to whether the participant is otherwise entitled to a distribution under the terms of the plan.[20]

[20] *Custer v. Custer,* [*supra* ].

Gavin L. Phillips, Annotation, *What Constitutes Order Made Pursuant to State Domestic Relations Law For Purposes of Qualified Domestic Relations Order Exception to Antialienation Provision of Employee Retirement Insurance Security Act of 1974 (29 U.S.C. § 1056(d)),* 79 A.L.R.4th 1081 (1991). Reading the statute to require the payment of a portion of a participant/working spouse's pension benefits to a non-working spouse only after the participant spouse has reached his or her "earliest retirement age comports with the purpose of pension benefits which are designed to protect the employee and non-employee spouse in their *later years, see*

*Ablamis,* 937 F.2d at 1457. Such a reading also comports with the purpose of ERISA, which is designed to protect pension benefits by "safeguard[ing] a stream of income for *pensioners (and their dependents . . .),* . . .", *id.* at 1454.

There is no dispute that according to the terms of the defendant's plan Mr. Stott will not reach his "earliest retirement age", 29 U.S.C. § 1056(d)(3)(E)(ii), until he reaches the age of 65. Accordingly, for the reasons indicated, to the extent that the Divorce Decree at issue in this case requires the defendant plan to immediately disburse (*i.e.,* "as soon as administratively possible") to the plaintiff 50% of Mr. Stott's pension benefits, and/or to the extent that the Decree requires that the defendant disburse 50% of Mr. Stott's pension benefits before he reaches his "earliest retirement age" according to 29 U.S.C. § 1056(d)(3)(E)(ii), I find that the Decree requires the defendant "to provide [a] type or form of benefit, or [an] option, not otherwise provided under the plan", 29 U.S.C. § 1056(d)(3)(D)(i); that, therefore, as it is currently written and/or interpreted by the plaintiff, the subject Divorce Decree is not a QDRO exempt from the spendthrift provision and ERISA preemption; and that plaintiff is not entitled to immediate disbursement of 50% of the pension benefits to which her husband is entitled as of December 31, 1989.

Accordingly, for the reasons stated, it is hereby RECOMMENDED that the defendant's motion for summary judgment be GRANTED; and that the plaintiff's motion for summary judgment be DENIED.[1]

**1.** Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the require-

ments of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).