**In re John Elbert WILLIAMS, dba John E. Williams, M.D., Medical Corp., Debtor.**

**Shannon Wilcox, aka Mary Williams, Plaintiff,**

v.

**John Elbert Williams, dba John E. Williams, M.D., Medical Corp., et. al., Defendants.**

**And Related Cross–Actions.**

**No. CV 97–4074 ABC.**

United States District Court, C.D. California.

May 24, 1999.

David Affeld, David A. Mallen, Law Offices of David W. Affeld, Los Angeles, CA, Joseph P. Buchman, Burke, Williams & Sorensen, Los Angeles, CA, for plaintiff.

Randall J. Dean, Allen Mescobi, Chapman, Glucksman & Dean, Los Angeles, CA, Jeanette Ross Gardon, Downey, CA, Rebecca Mocciaro, Farmer & Ridley, Los Angeles, CA, for defendant.

## ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT RE: QDRO ISSUES

COLLINS, District Judge.

Plaintiff's motion for partial summary judgment re: QDRO issues and EW & C and the Williams Defendants' cross-motions for summary judgment came on regularly for hearing before this Court on May 24, 1999. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Plaintiff's motion for partial summary judgment is GRANTED. EW & C and the Williams Defendants' motions for summary judgment are DENIED.

### I. Background

The issues presented in this case arise in large part from the parties' dispute regarding the application of law to the Marital Dissolution Judgment ("Dissolution Judgment") between Plaintiff Shannon Wilcox, a.k.a. Mary Williams ("Plaintiff") and Defendant John Elbert Williams ("Williams"). Specifically, the parties raise, by cross-motions for summary judgment, the issue of whether the Dissolution Judgment already constitutes or could be modified to constitute a qualified domestic relations order ("QDRO") as such term is defined by the Employee Retirement Security Act of 1974, as amended ("ERISA") (Title 29 of the U.S.C.), in connection with Plaintiffs' claims to a property interest in two ERISA-covered pension plans.

### A. Factual Background

The following facts are undisputed unless otherwise noted:

#### 1. Dissolution Judgment between Williams and Wilcox

On October 5, 1965, Williams and Wilcox married. In 1985, Williams and Plaintiff divorced. UF 13. Consequently, in a

family law action the Superior Court of the State of California entered a Dissolution Judgment on June 28, 1985 (sometimes referred to as a domestic relations order or "DRO"). EW & C's Request for Judicial Notice, Exh. 2. The Dissolution Judgment approved and attached the Marital Settlement Agreement, which provides for the distribution of the marital property of Williams and Wilcox. The Agreement provides for the distribution of the martial property of Williams and Wilcox. Under the Dissolution Judgment, Plaintiff was awarded as her sole and separate property a one-half interest in the "John E. Williams, M.D., Inc. Retirement Plans." *Id.* at ¶ 1(C). The Dissolution Judgment further provided for the "physical segregation of the Plan assets." *Id.* The segregation was ordered to be made "at the earliest possible time, but provided that it involves no adverse tax consequences to the parties." *Id.* The Dissolution Judgment also ordered "the Plan" to be valued as of May 18, 1984 and to be "divided equally as of that date." *Id.* The parties dispute whether the Plan Administrators received a copy of the June 1985 Dissolution Judgment.

### 2. The Benefit Plans

On or about July 31, 1974, John E. Williams, M.D., A Medical Corporation ("Medical Corporation") created the "John E. Williams, M.D., A Medical Corporation Employees' Money Purchase, Pension Plan" and the "John E. Williams, M.D., A Medical Corporation Employees' Profit–Sharing Plan" (collectively "Plans").[1] Pl.'s Stmt. of Genuine Issues in Opp'n to EW & C's Mot. for S.J., Undisputed Fact ("UF") 1. Defendant Williams along with some of his employees were participants in the Plans. UF 6.

From at least 1984 to April 1992, Jerome S. Mark ("Mark"),[2] Richard S. Hume ("Hume"), and Keith Nicol ("Nicol") served as members of the advisory com-

mittee of the Plans. UF 4. These individuals were all employed by Executive Business Management ("EBM"). Hume Decl. at ¶¶ 2, 6. EBM provided business management services to its clients, and often served as trustees of client trusts and pension and profit sharing plan administrators or advisory committee members. *Id.* at ¶ 2. EBM retained a third-party administrator to counsel EBM personnel with respect to the administration of pension plans. *Id.* at ¶ 3. For the Williams' Plans, EBM retained C/K Associates, Inc. ("C/K") as third-party administrators. UF 7.

### 3. Williams as Trustee of the Plans

In 1992, Williams took over from the administrative committee and served as the trustee and administrator for the Plans, in addition to continuing his role as Plans participant. UF 6. Williams' conduct during this period lies at the center of Plaintiff's Second Amended Complaint. In essence, Plaintiff alleges that Williams engaged in excessive withdrawals from the Plans in violation of the terms of the Dissolution Judgment and was aided in this process by the actions of other Defendants.

In early 1994, Williams stopped paying alimony. Affeld Decl., Exh. C at 148–49. In response, Plaintiff retained a lawyer to investigate and obtain payment for her. As part of the investigation, in June 1994, Plaintiff, through her attorney, demanded that Plaintiff's interest in the Plans be segregated in accordance with the terms of the Dissolution Judgment. Dean Decl., ¶ 5(a)–(b).

Although the parties dispute who hired EW & C, they agree that EW & C was retained to act as a consultant with respect to the calculation of the respective interests of Williams and Plaintiff in the Plans. *See* Pl's obj. to UF 10. Thereafter, EW & C also began to perform bookkeeping for

---

1. The Plans were employee benefit plans and thus regulated by the Employee Retirement Income Security Act as Amended ("ERISA"). UF No. 3.

2. Mark is now deceased. Hume Decl. at ¶ 6.

the Plans. UF 11. Specifically, EW & C prepared trial balances reflecting income and expenditures of the Plans. UF 11. The trial balances were then submitted to C/K which prepared the benefit statements and the Form 5500 C/Rs. UF 12. The parties dispute whether C/K also filed termination documents with the Internal Revenue Service and whether the Plans were, in fact, terminated. *See* Pl.'s Obj. to EW & C's UF 12.

#### 4. Williams' Bankruptcy

On December 24, 1996, Williams filed a Chapter 7 bankruptcy petition.

In Williams' bankruptcy petition, Williams claimed an exemption for what he asserted was his interest in the Plans. Pursuant to an order of the bankruptcy court filed February 11, 1998, objections by the bankruptcy trustee to Williams' claimed exemptions in the Plans were sustained. Pl.'s Amended Request for Judicial Notice, Exh. B. The Court held that to the extent that Williams had a beneficial interest in the Plans, the interest was the non-exempt property of the estate. Williams was thereafter divested entirely of any interest in the Plans.

The Bankruptcy Court later held that, by operation of law, Williams was divested of his capacity as Plan Administrator for

the Plans when he filed for bankruptcy. The bankruptcy trustee then assumed this position. After extensive briefing, bidding, hearings, and continuances, on October 22, 1998, the Court approved Plaintiff's appointment as Plan Administrator of the Plans. Pl.'s Request for Jud. Notice, Exh. C; Affeld Supp. Decl., Exh. D.[3]

#### 5. Plaintiff's Application to Obtain a Supplemental/Amended QDRO

Although Plaintiff contends that the 1985 Dissolution Judgment constituted a QDRO as a matter of law, Plaintiff also filed an application with the Los Angeles Superior Court seeking an order that the Dissolution Judgment Constitutes a QDRO or that the state court enter a supplemental/amended QDRO. The hearing on this issue was scheduled to be held on May 19, 1999.

### B. Procedural Background

Following Williams' December 1996 bankruptcy petition, Plaintiff filed a Complaint commencing an adversary proceeding on April 28, 1997.

On July 18, 1997, this Court granted in part EW & C's and Plaintiff's motions to withdraw reference of the adversary proceeding, by withdrawing the reference of the third through tenth causes of action of

---

**3.** Williams' motion for summary judgment attacks two Bankruptcy Court orders, specifically, the Bankruptcy Court Order Sustaining Trustee's Objections to Debtor's Claimed Exemptions, entered February 12, 1998 and the Bankruptcy Court Order of October 22, 1998 Authorizing Trustee to Compromise Controversy. The Court finds that these orders are irrelevant to the issues before the Court, i.e. whether the Dissolution Judgment constitutes a QDRO, or alternatively whether Wilcox is entitled to obtain a QDRO in state court. Moreover, even if these issues did bear upon the instant motions, Williams' objections arrive belatedly and are clearly in error. Williams did not bring a motion for reconsideration or appeal the ruling. This motion is not the proper forum in which to do so.

In any event, the Court finds Williams' objections are invalid. Defendant claims that the February 11, 1998 order was in error because the trustee filed his objections late,

10 months after the first creditors meeting, the deadline for issuing. Williams Motion for S.J. at 4 n. 10. However, as the docket for this case shows, the trustee continued the creditor's meeting from its original date several times, most recently to December 5, 1997. Supp. Affeld Decl., Exh. D.

Williams' collateral attack against the October 22, 1998 order is similarly misguided. Wilcox and the bankruptcy trustee originally sought approval of the settlement reflected in the October 22, 1998 order by filing a motion on August 24, 1998. Affeld Supp. Decl., Exh. D, entry nos. 61, 62. The docket reflects that after several different objections and continuances were permitted so that parties could engage in bidding for the claims Wilcox was seeking to obtain, the Bankruptcy Court had a three hour hearing on the issue before rendering its decision. It is far too late for Williams to protest the outcome of this well-considered matter now.

the adversary proceeding. Thus, Plaintiff's first two causes of action remain under the jurisdiction of the bankruptcy court.

On September 2, 1997, EW & C filed a motion to dismiss Plaintiffs' sixth, seventh, and eighth causes of action for fraud, RICO violations, and breach of contract, as well as a motion to strike Plaintiff's request for punitive damages and attorney's fees. On November 3, 1997, the Court granted EW & C's motion to dismiss as to Plaintiff's claims for fraud and RICO violations, with leave to amend. The Court also granted EW & C's motion to strike as to Plaintiff's request for punitive damages, with leave to amend.

Subsequently, on December 3, 1997, Plaintiff filed a First Amended Complaint alleging essentially the same causes of action contained in her original Complaint. On January 30, 1998, the Court denied EW & C's second motion to dismiss and motion to strike Plaintiff's amended claims of relief for fraud and RICO, as well as Plaintiff's request for punitive damages.

On January 13, 1999, the Court granted leave for Plaintiff to file a Second Amended Complaint ("SAC"). The SAC, filed on March 4, 1999, adds individual partners of EW & C, reflects Plaintiff's recently acquired standing to bring claims on the Plans' behalf, and accounts for information Plaintiff gleaned through one and one-half years of discovery.

Agreeing that the status of the Dissolution Judgment and other issues pertaining to the existence of a QDRO are central to many issues in this litigation, the parties stipulated to sever these issues for the Court's determination. Accordingly, on April 5, 1999, Plaintiff filed a motion for partial summary judgment re: QDRO issues. This motion was opposed by EW & C on May 3, 1999, the Williams Defendants on May 3, 1999, Defendant William Wolf, C/K on May 5, 1999, and Defendant William Wolf on May 10, 1999.[4] Plaintiff filed her reply on May 10, 1999.

Both the EW & C and the Williams Defendants filed cross-motions for summary judgment against Plaintiff on April 26, 1999.[5] Plaintiff filed an opposition to EW & C's motion on May 3, 1999, and to the Williams' Defendants on May 5, 1999. On May 10, 1999, both EW & C and the Williams Defendants filed their replies.[6]

## II. Discussion

### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (citing W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465,

---

4. C/K filed a joinder to EW & C's and the Williams' Defendants' oppositions to Plaintiff's motion for partial summary judgment on May 5, 1999. The Williams Defendants also joined EW & C's statement of genuine issues of fact in opposition to Plaintiff's motion.

5. C/K filed a joinder in both EW & C's motion and the Williams Defendants' motion on April 27, 1999 and April 29, 1999, respectively. Defendant William Wolf ("Wolf") also joined in EW & C's motion on April 28, 1999.

6. On May 20, 1999, two court days before the hearing on this matter, C/K filed a reply in support of C/K's opposition to Plaintiff's partial summary judgment motion and a motion to strike late filed declarations supportive of Plaintiff's motion. The pleading was procedurally improper, particularly as it was filed nearly two weeks after the reply which it addressed. In any event, the Court rejects the contentions in the rebuttal finding them repetitive of prior papers or, irrelevant to the issue of whether the Dissolution Judgment constitutes a QDRO.

487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings . . . [T]he adverse party's response . . . *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be

drawn in his favor. *Id.* at 248, 106 S.Ct. 2505; *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 669 (9th Cir.1955).

### B. Analysis

#### 1. ERISA's Non–Alienation Provisions and the QDRO Exception

■ Congress enacted ERISA to provide protections for participants in private employee benefit plans. 29 U.S.C. § 1001. To this end, Congress included so-called "spendthrift" provisions to " 'protect an employee from his own financial improvidence in dealings with third parties.' " *Hawkins v. Commissioner of Internal Revenue*, 86 F.3d 982, 988 (10th Cir.1996) (quoting *Amer. Tel. & Tel. Co. v. Merry*, 592 F.2d 118, 124 (2d Cir.1979).) As a general matter, therefore, ERISA prohibits forfeiture or alienation of pension plan interests. *See* 29 U.S.C. § 1056(d)(1).[7]

After ERISA's enactment, courts split as to whether ERISA's spendthrift provision should trump the state domestic relations laws which permitted plan benefits to be alienated or divided following the dissolution of a marriage or the death of a spouse. *See* S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566. As the Ninth Circuit noted, "The statutory confusion often left women who worked in the home and contributed significantly to the family's financial security without the ability to obtain any pension benefits upon their husband's death or upon divorce." *Ablamis v. Roper*, 937 F.2d 1450, 1453 (9th Cir.1991).

■ To address this inequity, Congress passed the Retirement Equity Act of 1984 ("REA"), Pub.L. No. 98–397, 98 Stat. 1426. The REA amended ERISA to recognize an express exception to the broad anti-alienation provisions where a QDRO exists. 29 U.S.C. § 1056(d)(3)(A). The purpose of the REA was "primarily to safeguard the financial security of widows and divorcees." *Ablamis*, 937 F.2d at 1453; *Mack-*

---

7. 29 U.S.C. § 1056(d)(1) provides that, "Each pension plan shall provide that benefits pro-

vided under the plan may not be assigned or alienated."

*ey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 838–39, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (stating that " 'primary focus'alienation of plan benefits for spouses seeking enforcement of domestic support orders."); *see also In re Gendreau*, 122 F.3d 815, 817 (9th Cir.1997) (same); *Metropolitan Life v. Wheaton*, 42 F.3d 1080, 1083 (7th Cir.1994) ("The draftsmen of the Retirement Equity Act were concerned with the financial security of the spouses and other survivors of employees who died enrolled in ERISA plans."). Thus, where a QDRO is in place, a spouse may enforce his or her rights under a plan. *Gendreau*, 122 F.3d at 819.[8]

### 2. Requirements of a QDRO

While protecting the interests of divorcees and widows, Congress also tried to reduce the expense of ERISA plans and protect plan providers from litigation for making improper payments. *Wheaton*, 42 F.3d at 1084. For this reason, it required that QDROs be "specific and clear." *Gendreau*, 122 F.3d at 817; *Wheaton*, 42 F.3d at 1084. In particular, to be classed as a QDRO a DRO must "clearly specif[y]": 1) the name and address of each alternate payee, 2) the amount or percentage of benefits or formula for determining such to be paid by the plan to the alternate payee; 3) the number of payments or period to which the order applies and 4) each plan to which the domestic relations order applies. 29 U.S.C. § 1056(d)(3)(C)(i)–(iv).

The statute also sets forth certain limitations as to what the DRO may contain to be considered a QDRO. Under subparagraph D, a qualified DRO: (1) may not require a plan to provide any type of benefit or option not otherwise provided under the plan, (2) may not require the plan to provide increased benefits; and (3) may not supersede any benefits already allocat-

ed under a previously approved QDRO. 29 U.S.C. § 1056(d)(3)(D)(i)–(iii).

■ The central purpose justifying these requirements must be borne in mind when determining whether a DRO satisfies ERISA's mandates. The requirements are to "spare the plan administrator from litigation-fomenting ambiguities as to who the beneficiaries designated by the divorce decree are." *Wheaton*, 42 F.3d at 1084. Accordingly, "the cases in this area all seem to allow some degree of latitude" in determining whether a DRO satisfies ERISA's mandates. W.P. Hogoboom & D.B. King, *Cal. Prac. Guide: Fam. Law* ¶ 10:465.1b (The Rutter Group 1998). Even courts which generally are more conservative in their approach to the ERISA requirements nonetheless caution against "unduly narrow" interpretations of the language within a DRO. *Hawkins*, 86 F.3d at 889–990. In rejecting a narrower approach by the tax court, the Tenth Circuit Court of Appeals reasoned that "[n]othing in the plain language of § 414(p)(1)(A)(i) [the I.R.S. counterpart to ERISA provision] exhorts domestic relations lawyers literally to mimic the statutory language when drafting these agreements." *Id.* at 990; *see also Wheaton* 42 F.3d at 1085 (finding QDRO where plan administrator was "not forced to run a *significant risk*" by failure of stipulation to specify division of proceeds from plan and finding order was "specific enough."). In *Wheaton*, Judge Posner explained that faithfulness to the statute not only permits, but mandates a flexible approach:

> To require more specificity would defeat the purpose of the provision creating an exception to inalienability for qualified domestic relations orders ... It is asking too much of domestic relations lawyers and judges to expect them to dot every *i* and cross every *t* in formulating divorce decrees that have ERISA impli-

---

8. Notably, the Ninth Circuit does not make a spouse's property interest contingent upon the QDRO. *Gendreau*, 122 F.3d at 819. Instead, the interest vests based on state property rights at the moment a dissolution order issues from the state court: "The QDRO pro-

visions of ERISA do not suggest that a [spouse who does not have a QDRO] has no interest in the plans until she obtains a QDRO[;] they merely prevent her from enforcing her interest until the QDRO is obtained." *Id.*

cations. Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be. We do not think Congress meant to ask the impossible, not the literally, but the humanly, impossible.

*Wheaton,* 42 F.3d at 1084.[9]

Moreover, even greater lenience is due to domestic relations orders which were drafted prior to the REA. *See Metropolitan Life v. Marsh,* 119 F.3d 415, 422 (6th Cir.1997) ("As the divorce decree was written before the REA amended ERISA in 1984, we should not demand literal compliance where Congress' intent has been to give effect to domestic relations orders where it is clear what the decree intended."); *Cummings by Techmeier v. Briggs & Stratton Retirement Plan,* 797 F.2d 383, 388–89 (7th Cir.1986), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986); *see also Layton v. TDS Healthcare Sys. Corp.,* No. C–93–1827–MHP, 1994 WL 224352, at *5 (N.D.Cal. May 17, 1994) (noting practice of finding QDRO despite absence of technical requirements for DROs entered before enactment of REA).[10]

Defendants, however, urge the Court to construe ERISA's requirements stringently. They refer the Court to the language of the Tenth Circuit in *Hawkins,* for instance, which asserts that relaxing the specificity requirements or eliminating them altogether in some cases "does violence to the plain meaning of the statute.... Nowhere ... has Congress implied that its factual requirements are optional, indeed, the language rather plainly states that a QDRO *'must'* clearly specify certain facts." *Hawkins,* 86 F.3d at 992 (citations omitted) (emphasis in *Hawkins* ). Through this lens, Defendants contend that the Dissolution Judgment does not constitute a QDRO. Specifically, Defendants assert that the Dissolution Judgment 1) fails to specify that Williams was a "participant" in the Plans; 2) the DRO does not specify when the alternate payee is to be able to begin receiving benefit payments and the number of payments or the period to which such order applies; 3) the DRO does not specify each plan to which such order applies; 4) the DRO wrongfully requires the Plans to provide for a benefit or option not otherwise provided under the Plans; 5) the DRO does not specify the amount or percentage of the participant's benefits to be paid by the Plans to the alternative payee and wrongfully provides for increased benefits; and 6) the order does not specify the name and last known address of the participant and each alternate payee covered by the DRO.

■ Keeping in mind the purpose behind the QDRO exception, and even accounting for the most exacting standards courts have required,[11] the Court finds the

9. Applying these standards to the instant plan, the likelihood that a plan administrator would be confused as to how to implement the DRO provisions relating to whom to pay and when is particularly low in this case. At its most active point, the Plans had just over a dozen participants. Indeed, for 13 years no administrator appears to have raised any point of confusion as to payment terms.

10. Such deference is similarly appropriate in this case, where the Agreement was prepared in the very early days of the REA legislation and the Dissolution Judgment was entered only six months after the REA took effect. EBM employees even wrote to C/K to determine how to conform the Agreement to the "new 1984 law." Affeld Decl., Exh. D at 188. C/K's response to this letter indicates that the new law referred to the REA. *See* Affeld Decl., Exh. D at 190.

11. The Court is skeptical as to the extent to which even the *Hawkins* case, by far the most conservative in its approach to the ERISA specificity requirements, actually advances Defendants' arguments. On its own review of the *Hawkins* opinion, the Court finds the *Hawkins* opinion does not require the exacting standards Defendants assert it does. Although *Hawkins* stands for the proposition that certain items enumerated in the requirements be present, it nonetheless demonstrates a willingness to find such requirements satisfied if at all possible in the DRO's text. *See* 86 F.3d at 988 (eschewing the tax court's interpretation as "unduly narrow"). Moreover, as opposed to the situation here, the *Hawkins* court interpreted a DRO which was

Dissolution Judgment satisfies ERISA's mandates, as explained below:

### a. Plan Participant (29 U.S.C. § 1056(d)(3)(B)(i))

ERISA defines a QDRO as a DRO "which creates or recognizes the existence of an alternate payee's right to ... receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i). Because the Dissolution Judgment does not identify Williams as a plan "participant," Defendants argue, it does not qualify as a QDRO.

Defendants' argument is meritless. First, it is worth noting that this "definition" is not included in ERISA's list of requirements. There is no indication that the labels of "participant" and "alternate payee" must be used to identify Williams and Wilcox in order for the DRO to be considered a QDRO. Rather, the definition merely describes the relationship between the parties that exists under a QDRO. Significantly, Defendants cite no case which even considers the propriety of using a party's name in a DRO, let alone any case which makes this issue determinative of the validity of a QDRO. Indeed, the opposite appears to be true. In *Hawkins*, the only case the Court discovered which directly addresses this issue, the Tenth Circuit Court of Appeals held that even thought the former spouse was not specifically identified as an "alternate payee" in the DRO, ERISA's requirements were satisfied because the divorcee did, in fact, come within the statutory definition of an "alternate payee." *Hawkins*, 86 F.3d at 990; *see also Marsh*, 119 F.3d at 417, 422 (finding valid QDRO where parties referred to by name). The *Hawkins* reasoning plainly also applies to a decree which fails to refer to Williams as a participant, but the parties involved fit the definitions of participant and alternate payee.

created in 1987, by which time the REA was already firmly established law.

**12.** Plaintiff asserts that the Agreement, which was approved by the Dissolution Judgment,

Second, even if parties are required by ERISA to identify themselves as "participants" in a plan, the Court finds the Judgment sufficiently complies. No plan administrator could reasonably question whether Williams himself was a participant in the Plans which bore his own name. The plan administrator never raised this issue previously, and no one disputes this fact now. Accordingly, the Court finds it would be an "unduly narrow" reading of the statute to require more precision. *Hawkins*, 86 F.3d at 889–990.

### b. Address Information (29 U.S.C. § 1056(d)(3)(C)(i))

In order to be considered a QDRO, ERISA first requires a DRO to contain the name and last known mailing address of the participant and each alternate payee covered by DRO. Defendants argue that the DRO fails to comply with this mandate because it lists neither Wilcox's nor Williams' last known address.

Courts have recognized that an attorney's address satisfies this requirement. *See Metropolitan Life v. Person*, 805 F.Supp. 1411, 1416 (E.D.Mich.1992), *abrogated on other grounds by Metropolitan Life v. Fowler*, 922 F.Supp. 8 (E.D.Mich. 1996); *Bass v. Mid–America Co., Inc.*, No. CIV. A.94–CV–40087–FL, 1995 WL 622397 (N.D.Ill. Oct. 20, 1995). Williams' attorney's address appears on the judgment; accordingly this requirement is satisfied as to the participant.

Although the Dissolution Judgment contains neither Wilcox's own address nor her attorney's address,[12] this requirement is unnecessary under the circumstances. The Senate Report accompanying the REA noted that a DRO would not be disqualified "merely because the order does not specify the current mailing address of the participant and alternate pay-

contains the address of Wilcox's attorney. *See* Pl.'s Motion at 15. However, the Court did not find this address anywhere in the Agreement.

ee if the plan administrator has reason to know of that address independently of the order." S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2566. Even the *Hawkins* court, which maintained a rigid approach to the QDRO requirements, did not reverse the tax court's finding that an otherwise qualified order would not be deemed unsatisfactory for failure to list a beneficiary's address because the plan administrator possessed this information. *Hawkins,* 86 F.3d at 993.

In this case, no one has suggested that Wilcox's address was unknown at any time. In fact, Wilcox and Williams appear to have been in contact frequently after their divorce. *See* Affeld Depo., Exh. C at 150–51. Accordingly, under the Senate Report and *Hawkins* reasoning, the Court finds Wilcox has sufficiently satisfied the address requirement.

### c. Number of Payments or Period (29 U.S.C. § 1056(d)(3)(C)(iii))

The list of criteria for a DRO to be considered qualified includes the provision that an order clearly specify the number of payments or period to which such order applies. *See* 29 U.S.C. § 1056(d)(3)(C)(iii). Defendants assert that the DRO at issue fails to meet this condition because it does not specify when Plaintiff should begin receiving payments.

Defendants rely on conclusory assertions to make this argument, failing to quote any of the Dissolution Judgment's language or explain why the DRO's text does not meet this standard of clause (iii). *See* EW & C's Opp'n at Motion at 12 ("The DRO at issue fails [the requirement of 29 U.S.C. § 1056(d)(3)(C)(iii) ] in that it does not specify when the alternate payee is to be able to *begin* receiving benefit payments from the Plans and the number of payments or the period to which such order applies. It is critical to understand that this ERISA section includes a mandate that the *order must clearly specify certain facts.*"); *see also* EW & C's Motion at 11 (same); Wolf's Opp'n at 5 (same). In fact, the Dissolution Judgment calls for the

physical segregation of Plan assets to be made "at the earliest possible time," provided, however, that no adverse tax consequences are caused. With similar language, the court in *Stott v. Bunge Corp.,* 800 F.Supp. 567, 575 (E.D.Tenn.1992), found no difficulty regarding the time of payments. Although finding the DRO did not qualify on other grounds, the court was untroubled by the time requirement where the dissolution agreement mandates that payments be made "as soon as administratively possible." *Id.* at 575; *see also Hawkins,* 86 F.3d at 993 (finding payment which was to be made "immediately" satisfied 29 U.S.C. 1056(d)(3)(C)(iii)). As long as a formula within a plan can be clearly and easily followed, courts have not hesitated to find the specificity requirements satisfied despite the fact that the decree calls for some modicum of interpretation. *See Wheaton,* 42 F.3d at 1084 (divining most "plausible interpretation" as to formula for dividing proceeds of plan, even though plan could be read consistently to support different outcome).

It is true that the Dissolution Judgment sets forth a time for segregation, but does not specifically set forth a detailed schedule for payments. This silence, however, when combined with the Dissolution Judgment's concern for tax liabilities, permits only one reasonable interpretation as to distribution: that distribution is to be made in a lump sum and in accordance with the provisions of ERISA and the Plans. As the *Stott* court's detailed review of literature on the REA indicates, payment can only be required after the participant spouse reaches his or her earliest retirement age. *Stott,* 800 F.Supp. at 574–75 (providing list of citations, including " 'REA's QDRO provisions specifically provide for payment of a pension benefit to an ex-spouse (alternate payee) before the participant elects to retire, but 'on or after the date on which the participant attains ... earliest retirement age.' " (citation omitted)). The *Stott* holding makes clear that problems only arise regarding payment dates when a dissolution agreement pro-

vides for a payment at times *other* than those envisioned by ERISA. The default position for an administrator, therefore, would be to follow ERISA and the plan's mandates.

Here, the Dissolution Judgment neither sets forth a periodic payment schedule nor provides that payment should occur immediately or at any date prior to Williams' earliest age of retirement. Mindful that the central concern in making a QDRO evaluation is whether an administrator would be confused or subject to litigation in implementing a plan, the Court finds that a reasonable administrator would have no difficulty in determining that payment would be in a lump sum and under such terms as ERISA and the Plans provide.

### d. Specification of the Plans (29 U.S.C. § 1056(d)(3)(C)(iv))

The next subdivision in ERISA provides that "each" plan to which a dissolution order applies must be "clearly specifie[d]." *See* 29 U.S.C. § 1056(d)(3)(c)(iv). According to Defendants, the Dissolution Judgment fails this requirement because it provides that Plaintiff is to receive an interest in the "John E. Williams, M.D. Inc. Retirement Plans." Notwithstanding this plural reference, Defendants point out that the remaining portions of the Dissolution Judgment only make reference to Williams and Wilcox's interests in the "Plan." Because Williams had two plans, a pension plan and a profit-sharing plan, and the DRO is unclear as to whether it applies to one or both of the Plans, Defendants contend that Plaintiff may not properly enforce her rights because the confusion in terms violates ERISA.

The slippage in language between "plan" and "Plans" is meaningless to any reasonable administrator. Defendants do not dispute that the two Plans shared the same bank accounts; their funds were invested jointly; the assets were at all times 100 percent commingled; and that they had the same employer ID number for tax purposes. Given this close relationship, it defies logic to argue that what is admitted-

ly sloppy draftsmanship could, in actuality, cause any confusion for a plan administrator. The plans were sufficiently intertwined that a reference to one is for all relevant intents and purposes, a reference to both.

### e. No Benefit Not Otherwise Provided (29 U.S.C. § 1056(d)(3)(D)(i))

ERISA prohibits any QDRO from requiring "a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." Defendants point to the DRO's call for physical segregation of the assets between the Plaintiff and Williams as a deficiency which keeps the DRO from being classed as a QDRO. The relevant paragraph of the Dissolution Judgment contemplates:

[A] physical segregation of the assets of the Plan.... The Plan IS ORDERED to be valued as of May 18, 1984, and divided equally as of that date. Earnings on the respective divided portions since May 18, 1984 are to be credited to the respective portions transferred to Petitioner and Respondent. In the event the Plan Administrator cannot determine values as of May 18, 1984, IT IS ORDERED that values may be determined as of the next succeeding date representing the end of the Plan year.

Dissolution Judgment, Section 1.C. Defendants interpret this paragraph to violate ERISA's "no separate benefit" requirement for several reasons, including that the DRO (1) orders the Plan to be valued as of May 18, 1984 (or as of the following end of the Plan year) (*see* Williams Motion at 21); (2) would require the Plans to be terminated and their assets divided equally on May 18, 1984 (*see* Williams Motion at 21); and (3) would require the establishment of individual investment accounts (*see* EW & C Motion at 12; C/K Opp'n at 5).

The Court is perplexed as to how Defendants arrive at these conclusions, particularly because Defendants neither ex-

plain their reasoning nor provide the Court with definitions. from case law,[13] treatises, or textbooks. The Court's own reading of the Dissolution Judgment reveals that neither immediate termination nor establishment of individual investment accounts is envisioned. The "physical segregation" is, rather, a method of accounting and a restriction of access. Indeed, the statute defines "segregated amounts" as amounts for which "the plan administrator shall separately *account*," as opposed to *pay*. 29 U.S.C. § 1056(d)(3)(H)(i) (emphasis added). Valuation of the Plans, which Defendants also claim exceeds the scope of the Plans, is simply a necessary part of this process. Given that even EW & C admits that upon entry of a QDRO, ERISA requires segregation[14] of accounts, the Court finds it nonsensical to suggest that by providing for this same segregation the Dissolution Judgment has somehow violated ERISA by supplying a benefit which the Plans do not otherwise supply.[15]

### f. No Increased Benefits (29 U.S.C. § 1056(d)(3)(D)(ii))

Finally, Defendants contend that the Dissolution Judgment violates ERISA requirements because it provides for *all* of the Plans' assets to be split between the parties. Defendants argue that the DRO therefore assumes incorrectly that Williams was the only member of the

Plans, when, in fact, the Plans included several of Williams' employees as participants.

This type of minutiae cannot be the basis for depriving a person of a vested right. The Dissolution Judgment literally confers upon Wilcox and Williams each "a one-half interest" in the Plans. However, this provision must be read in the context of the Agreement as a whole, the purpose of which is to divide marital community property. Consequently, the only fair reading of this provision indicates that the parties merely intended to split the *marital community's interest* in the Plans. One certainly cannot properly divide interests in an asset which one does not own. Accordingly, the Court declines to stretch this statement beyond its obvious, if not its literal, meaning.

### 3. Duties of the Plan Administrators to "qualify" a DRO

Even if the Dissolution Judgment satisfies ERISA's specifications, Defendants maintain that without being properly "qualified" by the plan administrators, it cannot be considered a valid QDRO. Because neither the Plans administrators for the 18 months following the date of the Dissolution Judgment nor any subsequent administrators made a determination that the Judgment was a QDRO, Defendants reason, the Judgment cannot properly be

---

**13.** The only case which any defendant even refers to in passing to support this proposition is *Stott*. *See* EW & C Motion at 12. However, the Court finds this case inapplicable here. In *Stott*, the DRO mandated the immediate "disbursement" of the spouse's benefits. Because Plaintiff would not be entitled to his payments until he reached his "earliest retirement age," the Court found that permitting an immediate disbursement would provide the spouse more rights than those provided under the plan. In this case, however, the terms do not permit an early disbursement or any option or benefit not otherwise available to plan members. Instead, all that is called for is a separate accounting for Wilcox's and Williams' account. The Court cannot find, and Defendants have not proffered, any explanation as to why or how these terms could be construed otherwise.

**14.** See EW & C's Opp'n at 3 ("Had a valid QDRO been obtained by the plaintiff, the administrators of the Plans would have properly segregated Williams' benefits long before EW & C had been retained to perform the accounting services for the Plans."); *see also* 29 U.S.C. § 1056(d)(3)(H).

**15.** Moreover, a review of the Plans reveals that segregated accounts were permitted. *See* Affeld Decl., Exh. A at § 9.3 ("Segregation and Disbursement.... When so directed, in writing, by the Committee, the Trustee shall segregate the Trust Fund, set up special accounts, and disburse the Trust Fund when disbursement becomes proper under the terms of the Plan...."); Exh. B at § 9.3 (same).

considered a QDRO under 29 U.S.C. § 1056(d)(3)(G)–(H).

Although it is clear that the ERISA statute mandates certain conduct by a plan administrator upon receipt of a DRO in order to qualify it as a QDRO, (*see* 29 U.S.C. § 1056(d)(3)(G)–(H)), case law does not suggest that a court is precluded from finding a valid QDRO despite the plan administrator's failure to follow this course. In *Marsh,* 119 F.3d at 421–22, for instance, the Sixth Circuit Court of Appeals considered whether a divorce decree from 1978 constituted a valid QDRO. The court was entirely unconcerned as to whether the plan administrator had made a determination as to the divorce decree's status as a QDRO. *Id.* Indeed, it appears that the qualification issue there, as here, had never been raised until nearly 20 years later when payment under the life insurance policy became due. *Id.* at 417. At this later date the court merely determined that the decree constituted a QDRO based solely on its compliance with the technical requirements of ERISA § 1056(d)(3)(B)–(C). *Id.* at 422; *see also Boggs v. Boggs,* 520 U.S. 833, 845, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (listing requirements for a domestic relations order to qualify as a QDRO as those found in 29 U.S.C. § 1056(d)(3)(C)–(E)); *Fortmann v. Avon Products, Inc.,* 1999 WL 160258, No. 97 C 5286 (N.D.Ill. March 9, 1999) (plan administrator's failure to follow its written procedures to determine the qualified status of DRO did not affect court's separate analysis as to whether DRO qualified as QDRO).

Undoubtedly this issue could have been more deftly handled had the Plans Administrators followed subpart (G) upon receiving a copy of the domestic relations order. *See Metropolitan Life v. Pettit,* 164 F.3d 857, 863–64 (4th Cir.1998) (noting importance of filing QDRO with plan administrator to ensure predictability, and minimize litigation). But even the strictest cases have held only that the purported QDRO be *received* by the plan administrator; they have not made a claimant's rights dependent upon the administrator taking further action once it is aware of the terms. *See Pettit,* 164 F.3d at 863 n. 6 ("According to the [ERISA] statute, the plan administrator must "receive" the QDRO and we imply nothing more. *See* 29 U.S.C.A. § 1056(d)(3)(G) (West 1998)."); *Cummings,* 797 F.2d at 388–89; *see also Layton,* No. C–93–1827–MHP, at *4.

The distinction between requiring filing of a DRO and not requiring any further action in order for a spouse's rights to be protected is understandable in light of the various purposes behind ERISA's specificity requirements. The Ninth Circuit in *Gendreau,* for example, noted that Congress included the specificity requirements because it was "concerned with reducing the expense to plan providers and protecting them from suits for making improper payments." *Gendreau,* 122 F.3d at 817. For this reason, too, courts have held that plan administrators need not "look beneath the surface" of a DRO in determining whether it constitutes a QDRO. *Blue v. UAL Corp.,* 160 F.3d 383, 385 (7th Cir. 1998); *Fortmann,* 1999 WL 160258, at *5; *see also Pettit,* 164 F.3d at 864 (refusing to hold administrator liable for failing to make payments based on contract external to QDRO because to do so would impact plan relationships based on "outside agreement of which the administrator will likely be unaware."). Under both these rationales, administrators can protect themselves, should they choose to do so, provided that they have received the dissolution judgment.

The Ninth Circuit's description of ERISA's QDRO mandates in *Gendreau* provides further support that notice, but nothing more, is required for a spouse to enforce her rights. In that case, the Ninth Circuit carefully distinguishes between the acts "required" of plan administrators and those they are "allowed" to do, noting Congress "*required* that QDROs be specific and clear and *allowed* plan administrators to approve the QDRO before they would be *required* to act in accordance with it." *Gendreau,* 122 F.3d at 817–18 (*citing*

*Wheaton*, 42 F.3d at 1084; 29 U.S.C. § 1056(d)(3)(G)) (emphasis added). The fact that, for their own protection, administrators are "allowed" to pass judgment as to the validity of a QDRO suggests that the onus to challenge a QDRO rests with them. Administrators bear the risk of loss, and they can protect themselves, should they have questions as to what is required of them under a marriage dissolution agreement, by withholding payment until they have determined a payment order meets certain specifications. *Id.*

Defendants argue, however, that a DRO filing is intended to serve not just the administrator, but to ensure that *all* parties have "notice and predictability," *Pettit*, 164 F.3d at 863. As the *Pettit* court noted, this purpose is sufficiently accomplished by the plan administrator's receipt of the DRO. The plan administrator lies at the center of the different relationships affected by a DRO. For this reason, the *Pettit* court concerned itself only with the information the administrator had when it made its QDRO determination, rather than the information which was available to the other parties involved or any external documents which may have been intended to affect the DRO's terms. *Pettit*, 164 F.3d at 863 ("If [the life insurance beneficiary] designation is trumped by an external contract, such as the property settlement agreement, then the relationships between the employee and the plan, the plan and the named beneficiary, and the administrator and the plan will all be impacted by an outside agreement of which *the administrator* will likely ·be unaware. This situation leads to unpredictability, whereas a QDRO, which must be filed with a *plan administrator*, provides notice and predictability for the plan administrator, participants, and beneficiaries." (emphasis added)).

If a plan administrator fails to perform its duties, and, for this reason, parties are injured or do not have notice of a qualifying DRO's provisions, then it makes no sense to punish a spouse for a plan's dereliction. Instead, as several courts have recognized, it is the plan administrator who should be subject to suit for failure to follow these procedures. *See Schoonmaker v. Employee Savings Plan of Amoco Corp.*, 987 F.2d 410, 414 (7th Cir.1993); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986). In *Fortmann v. Avon Products, Inc.*, No. 97 C 5286, 1999 WL 160258 (N.D.Ill. March 9, 1999), *8, plaintiff asserted that the plan did not properly notify him about a DRO it had received from plaintiff's spouse. Plaintiff claimed· this violated ERISA's mandate that the plan administrator establish written procedures to determine the status of a DRO. *See* 29 U.S.C. § 1056(d)(3)(G)(ii). The court examined the document upon which the administrators relied in making disbursement decisions and found it was a QDRO, notwithstanding the alleged failure of the plans to establish written procedures in accordance with subparagraph G. *Fortmann*, No. 97 C 5286 at *6. At the same time, the Court found that plaintiff could maintain an .action against the plan under ERISA for its alleged failure to maintain proper QDRO procedures. *Id.* at *7.

In this case, there is no question that the Plans administrators received the 1985 Dissolution Judgment. The three administrators, Hume, Mark, and Nicol, were all officers of EBM either by virtue of their employment with EBM (Hume and Nicol) or stock ownership (Mark). Hume Decl. ¶¶ 2, 8. Hume explained that as part of EBM's business management services, EBM often acted as trustees of client trusts and pension and profit sharing plan administrators. Hume Decl. ¶ 2. Williams, Hume, Mark, and Nicol served on the Plans' advisory committee on behalf of their client Williams as "part and parcel" of the services EBM rendered for the Plans. Hume Decl. ¶ 6 and Exh. A. As advisory committee members, the three acted as trustees and plan administrators. Hume Decl. ¶ 6.

According to EBM's bookkeeper, EBM had a copy of the Dissolution Judgment on file. Asido Decl. at ¶ 5. All advisory committee members, in addition to any EBM

employee, had access to these files. Hume Decl. ¶ 7; Asido Decl. ¶ 5. Thus, because it was filed at EBM, the Dissolution Judgment was on file with the advisory committee, the Plans' administrators.

As the *Pettit* court held, all that ERISA requires is that the DRO be filed with the plan administrators. *Pettit,* 164 F.3d at 863 n. 6. In this case, however, correspondence between C/K and EBM indicates that not only were the administrators aware of the DRO, but they also intended the Dissolution Judgment to be construed as a QDRO. In particular, on November 30, 1984, Robert Carusi, an EBM employee, contacted Arlene Kaplan, the former president of C/K, inquiring as to whether and how Wilcox could withdraw her segregated balances "under the current plan provisions and in conformity with the new 1984 law." *See* Affeld Decl., Exh. D at 188. Kaplan replied on December 13, 1984, noting that she had in the past been asked to segregate accounts due to DROs and explained the procedure. *See* Affeld Decl., Exh. D at 190. Although Kaplan stated that she could not, on counsel's advice, answer EBM's question, she enclosed a bulletin entitled, "The Retirement Equity Act of 1984; Impact on Your Retirement Plan." Later, in 1988, the subsequent president of C/K, Judith Superstein, informed John Harzell, an EBM employee, that C/K would "continue to follow-up on the status of the segregated account that you have indicated has been ordered by a QDRO on behalf of Mrs. Williams." Affeld Decl., Exh. D at 201.

Based on this documentary evidence, it is clear that the plan administrators treated or at least considered the Dissolution Judgment to be a QDRO. This evidence may not be used to prove that the parties were, in fact, correct, that the Dissolution Judgment was a QDRO.[16] However, the evidence suggests that despite the fact that the administrators never issued a formal statement approving of the DRO, this was because they never disputed either its existence or its validity.

### III. Conclusion

In short, because the Dissolution Judgment sufficiently satisfies the ERISA specificity requirements, and the Plans administrators received the Dissolution Judgment, the Court finds the Dissolution Judgment is a QDRO. Accordingly, the Court hereby ORDERS that Plaintiff's motion for partial summary judgment re: QDRO issues is GRANTED. EW & C and the Williams Defendants' motions for summary judgment are DENIED.

**SO ORDERED.**

16. Using the statements to prove that the Dissolution Judgment actually complied with the QDRO requirements would be improper hearsay. However, Defendants' evidentiary objections to these statements are overruled because Plaintiff does not employ these statements to prove the truth of the matter asserted, i.e. it is a QDRO because this letter called it a QDRO. Instead, these statements are being used to show that the parties believed and operated under the assumption that the Judgment was a QDRO. In other words, the statements are relevant to demonstrate both the declarant's state of mind (a hearsay exception under Fed.R.Evid. 803(3) and the hearer's reaction (which is not hearsay)). Accordingly, Defendants' hearsay objections are overruled.

Moreover, these documents were sufficiently authenticated by EBM employee, Cathy Asido. The letter from Kaplan of C/K to Carusi of EBM bears signs of authenticity in that it is a response to a properly authenticated document. *See* Asido Decl. ¶ 6; Fed.R.Evid. 901(2), (4). Defendants' other evidentiary objections to these items are overruled as meritless.