Filed 6/20/14  Marriage of Rush CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re the Marriage of VIRGINIA C. and DAVID H. RUSH. | C070841 |
| VIRGINIA C. MOON, | (Super. Ct. No. FL004059) |
| Appellant, | |
| v. | |
| DAVID H. RUSH, | |
| Respondent; | |
| PETERS, RUSH, HABIB & MCKENNA 401(K) PROFIT-SHARING PLAN, | |
| Respondent. | |

The marriage of appellant Virginia C. Moon and respondent David H. Rush ended in September 1995 with a judgment of dissolution and a stipulated order to divide their

1

community interest in David's retirement plan.[1]  The stipulated order stated on its face

that it was a qualified domestic relations order (QDRO) intended to comply with the

Employee Retirement Income Security Act (ERISA), Title 29 United States Code section

1001 et seq.

More than 15 years later, Virginia's attorney wrote to the plan administrator at

David's law firm asking about assets held by the 401(k) profit sharing plan (plan) for the

benefit of Virginia as alternate payee.  The plan administrator, David's law partner Mark

Habib, responded that David had managed Virginia's assets pursuant to instructions, and

the plan administrator enclosed a written summary of Virginia's interest in the plan.

More than a year later, however, when Virginia's attorney asked about formal

qualification of the domestic relations order (DRO) and requested a copy of the plan's

qualification procedures, the plan administrator indicated for the first time that he had just

determined the DRO was not qualified (was not a QDRO), based on procedures adopted

by the plan nine days earlier.

Virginia filed a complaint in federal court seeking to enforce the QDRO.  The plan

then intervened in the long-dormant family court proceeding and requested a declaration

that the DRO was not qualified.

Over Virginia's objection, the family court declared the DRO was not qualified

because it did not define the term "community interest."  Based on the family court's

order, David moved to dismiss Virginia's federal action.  The federal court initially

dismissed the action without prejudice, citing "prudential ripeness" concerns arising from

the family court proceedings which were, by that time, on appeal to this court.[2]  But the

---

[1]  We will refer to Virginia and David by their first names for clarity.

[2]  Respondents requested judicial notice of an order filed on September 10, 2012, dismissing without prejudice Virginia's claims before the United States District Court,

2

federal court subsequently vacated and withdrew its prior order and denied David's motion to dismiss. (*Moon v. Rush* (E.D. Cal., Aug. 6, 2013, No. 2:11-cv-03102-GEB-CKD) [2013 WL 4012828] pp. *1, fn. 1, *4.)

On appeal, Virginia contends (1) the DRO is sufficiently specific to be qualified; (2) David and the plan administrator lacked standing to move for a determination that the DRO was not qualified, and the family court exceeded its jurisdiction in ruling that the DRO was not qualified; and (3) the family court abused its discretion in denying Virginia's motion to stay the family court proceeding while a federal court case was pending.

At oral argument, David and the plan urged us to affirm the order disqualifying the DRO so that a new stipulated order can be negotiated and presented to the family court as a proposed QDRO. Meanwhile, the parties are pursuing their remedies in federal court and are scheduled for trial early next year.

We conclude the DRO is presumptively qualified, subject only to modifications agreed upon by the parties or ordered by the court to save the DRO from being legally ineffective. Accordingly, we will reverse the family court order filed on May 1, 2012. Because we reverse on the basis of Virginia's first appellate contention, we need not address her other contentions.

BACKGROUND

David and Virginia were married on March 21, 1977, and separated on July 6, 1993. On August 1, 1995, Virginia and David executed a document titled "Stipulation and Order Dividing Community Interest in Employee Benefit Plan -- Qualified Domestic Relations Order." On September 25, 1995, the family court signed the stipulated order, which was filed September 26, 1995, and contemporaneously signed and entered a

---

Eastern District of California (*Moon v. Rush* (E.D. Cal., Sept. 10, 2012, No. 2:11-cv-03102-GEB-CKD) [2012 WL 3962520]). Respondents' request is granted.

stipulated judgment dissolving the marriage. Until late 2011, the last item in the family court's file was a notice filed on November 1, 1995, regarding the withdrawal of Virginia's attorney.

At all relevant times, David was a lawyer practicing with a firm in Chico. His firm's 401(k) plan was named in the DRO. Paragraph 1 of the DRO identified Virginia as alternate payee, and David as participant, in the community property portion of certain assets within the plan. The DRO directed that any notices to the plan be sent to David as trustee. The word "administrator" was crossed out.

The DRO provided that the family court reserved jurisdiction as follows:

"24. The court reserves jurisdiction over this asset including but not limited to jurisdiction to order an alternate disposition of these benefits based upon the spousal parties' future agreement.

"25. Should any portion of this order be rendered invalid, illegal, unconstitutional, or otherwise incapable of enforcement, the court reserves jurisdiction to make such adjustment in this order as will effect the intent of the parties as manifested herein, including the equal division of the community portion of this asset."

In February 2010, counsel for Virginia wrote a letter addressed to the plan administrator at the law firm's address asking about assets held by the plan under terms of the DRO for the benefit of Virginia as alternate payee. David's law partner, Mark Habib, responded that the plan had no knowledge of the DRO. In June 2010, Habib, identifying himself as the plan administrator, acknowledged receiving a copy of the DRO and wrote to Virginia's lawyer that he had consulted with David and confirmed that David had "managed [Virginia's] assets in accordance with her instructions and wishes." Habib offered to transfer the assets held for Virginia to another plan or distribute them to her or, alternatively, to provide her with annual account statements. Habib enclosed with the letter a detailed written summary of assets under the heading "Pension Benefits Statement Regarding Virginia Moon's Interest in Peters, et al. Profit Sharing Plan, as set

forth in Paragraph 9 of the Stipulation & Order Dividing Community Interest In Employee Benefit Plan entered September 26, 1995, in Marriage of Rush, Butte Superior Court Case No. FL004059."

Fifteen months later, in October 2011, counsel for Virginia asked Habib about formal qualification of the DRO and requested a copy of the plan's DRO qualification procedures.[3] On November 15, 2011, Habib responded that he had just determined the order was not a QDRO pursuant to procedures adopted by the plan nine days earlier.

On November 21, 2011, Virginia filed a complaint against David and Habib and another law firm partner/plan trustee in the United States District Court for the Eastern District of California, seeking enforcement of the DRO and other relief. The parties named in the federal complaint stipulated to an order extending the time to answer until early 2012.

However, in December 2011, Habib intervened in the Rush divorce proceeding and filed a motion asking the family court to determine that the DRO did not qualify as a QDRO. Habib and David filed supporting declarations alleging that David did not give Habib a copy of the DRO until 2010 and Habib could not determine what the DRO meant by "community" interests because David had contributed to the plan before the marriage but David was not sure how much. David later joined Habib's motion. Virginia opposed the motion, arguing that the plan received the DRO when David signed it, not when he shared it with Habib, so it was too late to declare it unqualified; she also pointed out that Habib treated the DRO as qualified in 2010 and interpreted the very term he suddenly claimed was incomprehensible. Virginia asserted the federal court's pending jurisdiction, asking the family court for abstention or a stay; in the alternative, she asked the family

---

[3] A plan must maintain such procedures in writing and promptly communicate them to alternate payees upon notice of a domestic relations order. (29 U.S.C. § 1056(d)(3)(G).)

5

court to modify the DRO to incorporate the 2010 pension benefits statement if it found that the DRO lacked sufficient specificity to be a QDRO.

Late in January 2012, David filed a supplemental declaration stating that, if the family court found the order not qualified, he would request an order that *was* qualified. But in February 2012, he provided evidence that he had a balance of a little over $18,000 in a Keogh retirement account before he married Virginia, and he declared (with no supporting evidence) that he had rolled over some Keogh funds into the 401(k) plan that was the subject of the DRO. David provided no dates or amounts for the alleged rollover and said he was "searching for additional documents" to distinguish his separate assets from the community property interest shared by Virginia. He did not deny helping to prepare the 2010 pension benefits statement Habib sent to Virginia's lawyer, but he objected to having the summary incorporated into the DRO to identify assets belonging to Virginia. The pension benefits statement, David claimed, was no more than a historical record of how he had managed Virginia's assets during the 15 years before he told the plan administrator about the DRO.

On February 28, the family court heard oral argument. David's counsel contended, "Nobody is talking about staying the federal action, to have it all happen here. We just want this one little issue decided here quickly, and then the federal court action will go on, and no ruling by this court is going to hamper [Virginia's] rights in the federal court." Virginia's lawyer again urged the family court's abstention.

On March 13, 2012, the family court determined the DRO was not qualified because it did "not provide a basis for determining what is [David's] separate interest in the plan and what is the community interest." A formal order to that effect was filed on May 1. There is no evidence in the record that David ever presented an alternative proposed QDRO or offered evidence from which the family court might have modified the DRO to reflect the parties' 1995 intent. David and his law partners promptly moved to dismiss Virginia's federal action.

6

DISCUSSION

ERISA generally prohibits the assignment or alienation of retirement benefits, but it includes an exception for QDRO's designed to safeguard the financial security of nonemployee spouses and dependents. (*Ablamis v. Roper* (9th Cir. 1991) 937 F.2d 1450, 1453.) State laws relating to pension benefits are preempted by ERISA, and thus a nonemployee spouse may enforce a community interest in an employee spouse's retirement benefits only if the interest is transferred by a QDRO. (*In re Marriage of Rich* (1999) 73 Cal.App.4th 419, 423.) A transfer of plan benefits is ineffective unless the order satisfies ERISA's QDRO criteria. (*In re Marriage of Shelstead* (1998) 66 Cal.App.4th 893, 899.)

A domestic relations order that grants marital property rights to a spouse of a participant in a plan (an "alternate payee") is qualified only if it meets criteria not at issue in this case and also specifies "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." (29 U.S.C. § 1056(d)(3)(B)-(C)(ii).) These requirements are not to be construed in an overly narrow manner. (*Hamilton v. WA State Plumbing Pension Plan* (9th Cir. 2006) 433 F.3d 1091, 1097.) The "pivotal question" is whether the dissolution order contains enough information for the plan administrator to make an informed decision about distribution. (*Ibid*.) Substantial compliance with the requirements is sufficient. (*Metropolitan Life Ins. Co. v. Marsh* (6th Cir. 1997) 119 F.3d 415, 422.)

The order at issue granted Virginia, among other things, "[a]ll of the community interest in" a piece of real property held by the pension plan on behalf of David, but Habib claimed the DRO was not qualified because he could not identify what interest in the property was "community." Inclusion of the term "community interest" in a DRO does not render a DRO unqualified. (*Stewart v. Thorpe Holding Co. Profit Sharing Plan*

7

(9th Cir. 2000) 207 F.3d 1143, 1150.)  The wording may create some ambiguity in this case, but not enough to render the plan unqualified at such a late date.

Community property interests are those acquired during marriage.  (Fam. Code, § 760.)  David declared that he could not distinguish contributions he made to the plan during his marriage to Virginia from those he made beforehand.  However, both David and Habib had access to the plan's records, including the dates and amounts for David's contributions to the plan.  Neither claimed to have made an attempt to identify or trace David's separate property interest.  (See Fam. Code, § 2640 [separate property can be traced to purchase of community asset].)

Before the dissolution, David and Virginia were required by law to disclose to one another and to the family court "[a]ll material facts and information regarding the characterization of all assets and liabilities."  (Fam. Code,§ 2105, subd. (b)(1).)  When parties divide pension assets, the party with better access to information about the assets "must acquire and disclose such information to the other spouse."  (*In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1348.)  In this case, David necessarily had superior (and perhaps exclusive) access to information about his own pension assets, including the extent to which his pension fund's investment in the disputed real property was traceable to separate rather than community property.  He had an affirmative duty to discover and disclose the facts to Virginia before they dissolved their marriage and he offers no explanation for not disclosing the same facts to his law partner, the plan administrator, in order to identify and segregate any separate property interests.  Tellingly, David did not ask the family court to characterize some or all of the disputed property interest as separate; he asked the family court to declare the order he had negotiated unqualified and ineffective.

A plan administrator may make an initial determination "within a reasonable period after receipt" whether a DRO is specific enough for the plan to be able to enforce it, that is, whether it is qualified.  (29 U.S.C. § 1056(d)(3)(G)(i)(II) & (H)(i).)  Congress

8

contemplated that further proceedings might be necessary after a retirement plan is divided if a plan administrator finds the terms of a DRO unclear. Thus, ERISA includes an 18-month period for the plan to segregate accounts and allow an alternate payee to cure defects and obtain an enforceable QDRO. (*Trustees of Directors Guild of America v. Tise* (9th Cir. 2000) 234 F.3d 415, 422, opn. mod. 255 F.3d 661.) But "[t]here is no reason it should take any plan administrator 18 months to puzzle over" a DRO, and "Congress did not intend to sanction such administrative lassitude" by recognizing the need for adequate time to address defects. (*Ibid*.)

California law allows a plan to move to set aside or modify a DRO within the divorce proceeding itself, provided that the plan acts promptly. (Fam. Code, § 2073 [enforcement of order affecting employee benefit plans are stayed for 30 days so plan can be served and file objections; the parties and the court are expected to promptly address any challenges asserted by the plan].) If a plan administrator fails to timely object to a DRO, however, "it makes no sense to punish a spouse for a plan's dereliction." (*In re Williams* (C.D.Cal. 1999) 50 F.Supp.2d 951, 964.) Rather, a DRO may be declared a QDRO based on the plan administrator's inaction. (*Id.* at p. 963.) And the plan need not be a party to a dissolution proceeding to be bound by the terms of a QDRO. (*In re Marriage of Baker* (1988) 204 Cal.App.3d 206, 218.)

The plan's request for a declaration that the DRO was not qualified -- brought 16 years after David signed the DRO as party and trustee, and 18 months after the plan administrator acknowledged it in writing -- was unreasonable and untimely. (See *In re Williams, supra*, 50 F.Supp.2d at p. 963 ["even the strictest cases" requiring actual receipt by the plan administrator "have not made a claimant's rights dependent upon the administrator taking further action once it is aware of the terms"].) The plan's reliance on *In re Marriage of Levingston* (1993) 12 Cal.App.4th 1303, is misplaced because the retirement plan administrator in that case acted promptly (within months after execution

of the DRO) to notify the parties that the administrator believed the DRO was not qualified. (*Id*. at pp. 1304-1305.)

In any event, the DRO is presumptively qualified. A family court's role with respect to pension assets is to make "whatever orders are necessary or appropriate to ensure that each party receives the party's full community property share in any retirement plan." (Fam. Code, § 2610, subd. (a).) And its role in interpreting a stipulated order is to make it an enforceable statement of the parties' intent. (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1252.)

Family court jurisdiction over a QDRO is intended to "clarify and fix any technical defects in the original DRO." (*Carmona v. Carmona* (9th Cir. 2010) 603 F.3d 1041, 1056; accord, *In re Marriage of Oddino* (1997) 16 Cal.4th 67.) A QDRO does not create a new property interest, but renders enforceable an already existing interest, so the alternate payee's right to an enforceable QDRO is *presumed* during any period of DRO refinement. (*Trustees of Directors Guild of America v. Tise*, *supra*, 234 F.3d at p. 421; *In re Gendreau* (9th Cir. 1997) 122 F.3d 815, 818 [right to QDRO established under state law at time of divorce decree].) Here, the DRO was clearly intended by David and Virginia, and by the family court in 1995, to effectively transfer the entire community

10

share of the disputed property to Virginia.[4]  The family court's ruling on qualification was erroneous.

## DISPOSITION

The family court order filed on May 1, 2012 (declaring that the DRO is not qualified) is reversed.  Virginia shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278 (a)(1), (2).)


                                                          MAURO            , J.


We concur:


_____ BUTZ _____ , Acting P. J.


_____ HOCH _____ , J.

---

**[4]**  Paragraph 9 of the DRO transferred "[a]ll of the community interest" in two assets and "[o]ne-half of the community interest" in two other assets to Virginia; at oral argument, the parties reported that three of the four assets were transferred without dispute.