**Barbara SMITH, Plaintiff,**

v.

**ESTATE OF Mark SMITH and Du-Pont Pension and Retirement Plan, Defendants.**

**CIVIL ACTION NO. 99–5973.**

United States District Court, D. New Jersey.

Feb. 19, 2003.

Darrell Fineman, Esq., Capizola, Fineman & Lapham, P.C., Vineland, NJ, for Plaintiff, Barbara Smith.

Mark J. Oberstaedt, Esq., Timothy E. Stauss, Esq., Archer & Greiner, P.C., Haddonfield, NJ, for Defendant, DuPont Pension. and Retirement Plan.

ORLOFSKY, District Judge.

Plaintiff, Barbara Smith ("Smith"), and Defendant, DuPont Pension and Retirement Plan ("DuPont"), have cross-moved for summary judgment. These cross-motions raise issues of law that fall within the arcana of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, which have not been frequently addressed by this Court—specifically: (1) under what circumstances does a Property Settlement Agreement ("PSA"), incorporated into a Judgment of Divorce, qualify as a Qualified Domestic Relations Order ("QDRO") excepted from ERISA's broad preemption of state laws relating to pension plans?; and (2) is a QDRO binding on a plan administrator, despite the parties' failure to send a copy of the order to the plan?

For the reasons set forth below, I find that the PSA in this case does qualify as a

QDRO that is excepted from ERISA's broad preemption of state laws. Because ERISA requires no more of a PSA to be qualified as a QDRO than to meet the requirements of the statute, the fact that the pension plan never received a copy of the order does not defeat the claimant's entitlement to benefits. Accordingly, I shall grant Plaintiff's motion for summary judgment and deny Defendant DuPont's cross-motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Mark Smith was employed by DuPont from July 9, 1973 until October 3, 1988. *See* Aff. of Marsha G. Cauthen, 4/10/00, ¶ 5. He was thirty-six years old when he resigned from DuPont after more than fifteen years of service. *See id.* ¶¶ 5–6. Plaintiff, Barbara Smith, obtained a final judgment of divorce from Mark Smith on Sept. 24, 1990. *See* Pl.'s Ex. A (copies of judgment and order).[1] Mark Smith died on September 26, 1998 at the age of forty-six. *See* Pl.'s Ex. B (death certificate).

Smith claims that DuPont denied her the pension benefits due to her under a Property Settlement Agreement reached between her and her ex-husband, Mark Smith. The PSA provides, in relevant part:

Husband therefore does hereby irrevocably assigns[sic] to Wife the sum of 50% of his said pension. The E.I. DuPont DeNemours Company is hereby authorized to pay to Wife 50% of Husband's pension entitlement, directly to the Wife, at the time Husband begins to receive the said pension. If, a death benefit is paid in lieu of the pension then a minimum of 50% of that death benefit shall be paid to wife.

---

1. "Pl.'s Ex." designations refer to the exhibits attached to Plaintiff's subsequent Brief in Support of Summary Judgment, filed June 27, 2002.

Pl.'s Ex. A (PSA, Art. V). On November 6, 1998, Plaintiff wrote to DuPont, attaching copies of the divorce judgment and PSA, and requested the death benefit to which she believed she was entitled under the PSA. *See* Cauthen Aff. ¶ 10. DuPont had not previously received copies of either the Judgment of Divorce or the PSA. *Id.* ¶ 11.

On November 9, 1998, Marsha G. Cauthen, DuPont's Employee Benefits Coordinator, wrote to Plaintiff, informing Smith that her request for benefits had been denied. *See* Pl.'s Ex. B. Cauthen informed Smith that there were no benefits available to her because she had failed to present a QDRO to DuPont. *Id.* Cauthen further explained that Smith's ex-husband's benefits are governed by ERISA, and that the statute only permits DuPont to release benefits to a former spouse if it is in possession of a QDRO. *Id.*

On February 15, 1999, Smith again wrote to DuPont, P.O. Box 436, Little Falls, New Jersey, 07424, requesting an appeal form for survivor benefits. *See* Def.'s Supp'l Mem. of Law in Supp. of Summ. J., 12/28/00, Ex. A. On March 24, 1999, Plaintiff sent a copy of the February 15, 1999 correspondence to DuPont Connection, at the same address, marking it "second request." *Id.*, Ex. B. On July 23, 1999, Kimberly A. Hill of the Survivor Benefits Unit of DuPont Connection responded to Smith's two letters and informed Smith that DuPont's original decision regarding Smith's benefits that had been reached on November 9, 1998 remained unchanged. *See* Pl.'s Ex. C. Hill further explained to Smith, "If you would like to pursue this further, you can exercise your rights under ERISA as stated on page 28 of the Pension and Retirement Summary Plan Description." *Id.* Hill attached a copy of the relevant sections of the plan description.

DuPont's "Pension and Retirement Plan," originally adopted on September 1, 1904, and as last amended March 1, 1998, is over 120–pages–long and contains nine appendices. Plaintiff points to two sections of the Plan under which she believes she is entitled to benefits, Sections V and VI. Section V creates a vested right to deferred pension in certain employees, as well as their spouses, who meet the specified eligibility criteria. *See* DuPont Plan § V.A(1) (attached to Cauthen Aff. as Ex. A). Section VI provides company-paid survivor benefits to certain employees who meet the specified eligibility criteria. *Id.* § VI.A.

Smith's Complaint, which was first filed in New Jersey Superior Court and subsequently removed by DuPont to this Court on December 22, 1999, contended that DuPont wrongfully denied her access to her ex-husband's pension benefits. This is the second time these parties' cross-motions for summary judgment have been presented to this Court. On January 5, 2001, I heard oral arguments on the original cross-motions for summary judgment and concluded that Smith had failed to exhaust her administrative remedies, as required by ERISA. Thus, I granted DuPont's motion for summary judgment without prejudice and administratively terminated the action, so that Smith could file an out-of-time administrative appeal and reopen her case once she satisfied the exhaustion requirement. *See* Order, *Smith v. Smith,* Civ. A. No. 99–5973 (D.N.J. Jan. 5, 2001).

In correspondence dated May 22, 2001, DuPont informed Smith that it had completed its review of her appeal. *See* Pl.'s Ex. G. DuPont's position with respect to the QDRO requirement remained unchanged: "DuPont Legal has determined that the order submitted in this case does not meet the requirements of a QDRO for many technical reasons, including the

identification of the Plan, definition of the benefit, the formula for calculating the alternate payee's benefit, as well as other areas." *Id.*

■ Having satisfied ERISA's exhaustion requirement, Smith has now moved to reopen her case. As I noted during the January 5, 2001 hearing, I interpret Smith's action to be one for civil enforcement pursuant to 29 U.S.C. § 1132(a)(1)(B). Actions brought under this section are equitable in nature, and do not provide for a right to a jury trial. *See Pane v. RCA Corp.*, 868 F.2d 631, 636 (3d Cir.1989). Once again in this action, both parties have filed cross-motions for summary judgment.

■ I shall review *de novo* the plan administrator's decision that the Smiths' PSA does not constitute a QDRO. *See Samaroo v. Samaroo*, 193 F.3d 185, 189 (3d Cir.1999). This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1132(e)(1). I have considered the submissions of the parties and decided these cross-motions for summary judgment on the papers without oral argument, pursuant to Fed. R.Civ.P. 78.

## II. THE LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

The legal standard governing summary judgment is well-settled. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)

(West 2002); *see also Anderson v. Consol. Rail Corp. ("Conrail")*, 297 F.3d 242, 247 (3d Cir.2002). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Conrail*, 297 F.3d at 247 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it bears on an essential element of the plaintiff's claim. *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (*citing Anderson*, 477 U.S. at 248–251, 106 S.Ct. 2505). Thus, to survive a motion for summary judgment, the party contesting the motion must demonstrate a dispute over facts that might affect the outcome of the suit. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (*citing Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505).

Summary judgment is proper "if after adequate time for discovery and upon motion, a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Conrail*, 297 F.3d at 247 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[2] "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.*

---

**2.** Local Civil Rule 56.1 of this Court also requires that, on motions for summary judgment, each side must submit statements identifying material facts as to which there does or does not exist a genuine issue. *See id.*

(Gann 2002). "[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted." *Hill v. Algor*, 85 F.Supp.2d 391, 408 n. 26 (D.N.J.2000).

Here, neither party has asserted the existence of any genuine issue of material fact which would preclude summary judgment. Thus, this case is ripe for summary judgment on the questions of law presented.

## III. DISCUSSION

### A. QUALIFIED DOMESTIC RELATIONS ORDERS UNDER ERISA

■ The parties agree that the plan at issue, the DuPont Pension and Retirement Plan ("Plan" or "DuPont Plan"), is governed by ERISA. When ERISA is silent on an issue, courts have applied federal common law to fill in the gaps. *See Zienowicz v. Metro. Life Ins. Co.*, 205 F.Supp.2d 339, 344 (D.N.J.2002) (citing *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 (3d Cir.1993)). Additionally, in applying federal common law, this Court may draw from analogous New Jersey state law. *See id.*

■ As a general rule under ERISA, pension plan benefits are neither assignable nor alienable. *See* 29 U.S.C. § 1056(d)(1) (West 2002). A narrow exception to this anti-alienation provision, however, *see* 29 U.S.C. §§ 1056(d)(3)(A) and 1144(b)(7), permits the assignment or alienation of benefits under a State-issued "qualified domestic relations order" ("QDRO") *Id.* The QDRO is one of the few exceptions to ERISA's broad preemption of state laws which relate to employment benefit plans. *See* 29 U.S.C. §§ 1144(a). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). In the absence of a valid QDRO, a plan violates ERISA if it pays anyone other than the participant or his or her designated beneficiary.

■ QDRO's were enacted as part of the Retirement Equity Act ("REA"), an amendment to ERISA that took effect on January 1, 1985. Pub.L. No. 98–397 § 303(d), 98 Stat. 1426 (1984). The REA was designed to give effect to divorce decrees and related State-court orders that pertained to ERISA-regulated plans. *See Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 441 (2d Cir.2002) (citing *Boggs v. Boggs*, 520 U.S. 833, 847, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997)). "The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during their retirement as a means of income." *Boggs*, 520 U.S. at 854, 117 S.Ct. 1754; *see also Gendreau v. Gendreau*, 122 F.3d 815, 817 (9th Cir.1997) ("QDRO exception was enacted to protect the financial security of divorcees").

A "domestic relations order" is any judgment, decree, or order made pursuant to a State domestic relations law that relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant. 29 U.S.C. § 1056(d)(3)(B)(ii). A domestic relations order must clearly specify the following four items in order to be considered "qualified":

(1) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order;

(2) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined;

(3) the number of payments or period to which such order applies; and

(4) each plan to which such order applies.

29 U.S.C. §§ 1056(d)(3)(C)(i)-(iv) (West 2002). Furthermore, a QDRO must not require a plan to provide any type or form

of benefit, or any option, not otherwise provided under the plan, must not require the plan to provide increased benefits, and must not interfere with required payments under a previously approved QDRO. *See* 29 U.S.C. § 1056(d)(3)(D).

■ The purpose behind these requirements "is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of uncertainty concerning the identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant." *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1084 (7th Cir. 1994) (Posner, C.J.). A divorce decree that meets the requirements contained in 29 U.S.C. § 1056(d) provides all the necessary information to determine the identity of a beneficiary without creating unreasonable administrative burdens for the plan administrator. *See Carland v. Metro. Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir. 1991).

## B. WHETHER THE PSA SATISFIES THE REQUIREMENTS OF 29 U.S.C. § 1056(d)(3)(C)

■ DuPont contends that Barbara and Mark Smith's PSA is not a "qualified" domestic relations order because it does not adequately specify the type of benefit available to either party, the amount or percentage of the benefit to be paid, the manner in which the payment is to be determined, the number of payments, or the time period such payments are to be made, as required by 29 U.S.C. § 1056(d)(3)(C). *See* Cauthen Aff. ¶¶ 14–17. According to DuPont, if the PSA had been submitted to the Plan during Mark Smith's lifetime, the Plan would have returned it to the parties' attorneys for clarification and amendment. *Id.* ¶ 18.

■ Barbara and Mark Smith's Final Judgment of Divorce, *see* Cauthen Aff., Ex. C, ¶ 2, which incorporates the PSA by reference, clearly constitutes a domestic relations order. This is because it was: (1) issued pursuant to New Jersey state domestic relations law, and (2) relates to the parties' marital property rights. *See* 29 U.S.C. § 1056(d)(3)(B)(ii). Whether a domestic relations order qualifies as a QDRO depends on the language of the order itself; the subjective intentions of the parties are not controlling. *See Hawkins v. Comm'r of Internal Revenue*, 86 F.3d 982, 989–90 (10th Cir.1996).

The Smiths' Judgment of Divorce and PSA do not track the language of 29 U.S.C. § 1056(d), which is no surprise. These documents were not prepared with the maintenance of ERISA benefits in mind as their primary purpose.[3] The question is whether these documents, nonetheless, adequately provide the information required under the statute to qualify as a QDRO. Again, this required information includes: (1) the names and last known mailing addresses of the plan participant and the alternate payee, *see* 29 U.S.C. § 1056(d)(3)(C)(i); (2) the amount or percentage of benefits to be paid, and manner of payment, *id.* § 1056(d)(3)(C)(ii); (3) the number or period of payments, *id.* § 1056(d)(3)(C)(iii); and (4) identification of the plan, or plans, to which the order applies, *id.* § 1056(d)(3)(C)(iv).

---

**3.** Indeed, *Wheaton* suggests: "It is asking too much of domestic relations lawyers and judges to expect them to dot every *i* and cross every *t* in formulating divorce decrees that have ERISA implications. Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be." *Id.*, 42 F.3d at 1085. Hopefully, nearly a decade after *Wheaton* was decided, more lawyers are now conversant with ERISA. Still, many of the divorce decrees that are now being litigated today were drafted years ago.

### 1. Names and Last Known Mailing Addresses

The Smiths' PSA, executed in May 1990, indicates the last known addresses of both Mark Smith, the plan participant, and Barbara Smith, the alternate payee, in its opening paragraph:

> THIS AGREEMENT made between BARBARA SMITH, residing at 14 Gillison Avenue, Penns Grove, Salem County, New Jersey ... and MARK SMITH, residing at the White Oaks Motel, Carneys Point, Salem County, New Jersey ...

PSA, Cauthen Aff., Ex. C. Thus, the PSA clearly satisfies the name and address requirements of 29 U.S.C. § 1056(d)(3)(C)(i).

### 2. Amount or Percentage of Benefits and Manner of Payment

The PSA also adequately specifies the percentage and manner in which benefits are to be paid: "Husband ... does hereby irrevocably assign to Wife the sum of 50% of his said pension." PSA, Art. V. In addition, the PSA provides that "[i]f, a death benefit is paid in lieu of the pension then a minimum of 50% of that death benefit shall be paid to wife." *Id.* The language of the Smiths' PSA is similar to the language of a PSA that was qualified as a QDRO in *Ross v. Ross,* 308 N.J.Super. 132, 154, 705 A.2d 784, 795 (App.Div.1998). The *Ross* PSA granted the plaintiff the right to one-half of her spouse's pension benefits while he was alive, as well as "the survivor annuity of the pension plans, as per the provisions of the plans." *Id.*

DuPont argues that the PSA's "minimum of 50%" death benefit language is vague, and I agree. Smith, however, seeks no more than fifty percent of her ex-husband's death benefit, *see* Pl.'s Reply Br. at 9, n. 1, and, therefore, I need not address this issue at length. To the extent the PSA is vague in terms of the percentage of benefits available to her, Smith agrees that it should be strictly construed against her.

The PSA itself does not explicitly specify the manner in which Barbara Smith's spousal benefit is to be calculated, but DuPont need look no further than the underlying document, its own voluminous Pension and Retirement Plan, to determine the appropriate formula. Section V of the DuPont Plan provides, *inter alia,* coverage to the spouses of former DuPont employees:

> If the *former employee* had not attained earliest benefit commencement age, monthly payments will be made to the spouse equal to 50% of the former employee's pension calculated under paragraph B of this Section as though he had applied for benefits at earliest benefit age and reduced as provided in subparagraphs (3) and (4) below ...

*Id.* § V(C)(2)(d) (emphasis added). Subparagraph (3) of the Plan contains a table detailing the reduced amount of coverage available "after termination of employment but before commencement of pension payments." DuPont Plan § V(C)(3). Thus, the PSA indeed satisfies the requirements of 29 U.S.C. § 1056(d)(3)(C)(ii) because the formula for determining benefits is readily ascertainable.

### 3. Number or Period of Payments

As for the number or period of payments, once again, Dupont need look no further than the terms of its own Pension and Retirement Plan. Under Section V(C)(2)(d) of the Plan, monthly payments are to be paid, to "begin with the month following that in which the employee would have attained earliest benefit retirement age and end with the month in which the spouse dies." *Id.*

██ DuPont argues that the PSA's language, providing Smith with "a minimum of 50% of that death benefit," is

ambiguous because "that" could refer to "a pre-retirement survivor benefit, a post-retirement survivor benefit, or both." Dupont's Br. in Supp. of Cross Mot. for Summ. J., at 15. Company-paid survivor benefits are available under the Plan only under three circumstances:

> [F]ollowing the death on or after January 1, 1985 of (a) an *active* employee with 15 or more years of service, (b) a former employee who retired with pension under Section IV on or after January 1, 1985, or (c) a former employee who had 15 years of service upon transfer to an affiliated group company ...

DuPont Plan § VI(A)(1) (emphasis added). Although Mark Smith had more than fifteen years of service with the company, *see* Cauthen Aff. ¶ 5, he was not an active employee as of the date of his death; it is undisputed that Mark Smith resigned from DuPont. *Id.* ¶ 6. He never retired from DuPont, and indeed could not have, as the earliest possible age for retirement from the company is fifty years, *id.*, and Mark Smith died at the age of forty-six, *see* Pl.'s Ex. B. Finally, Mark Smith did not transfer to an affiliated group company, so Section VI(A)(1)(c) is not applicable either. I agree with DuPont that, under the terms of the DuPont Plan, Smith is not entitled to survivor benefits. As I noted earlier, however, the Plan does provide a formula for calculating spousal benefits, even if a former employee dies prior to reaching earliest benefit commencement age. *See* DuPont Plan § V(C)(2)(d). Thus, I find that the PSA satisfies 29 U.S.C. § 1056(d)(3)(C)(iii).

#### 4. Identification of Plan to Which Order Applies

Finally, the PSA adequately specifies the one plan to which it applies, the DuPont Pension and Retirement Plan. Indeed, the PSA does not mention any other plan and clearly explains that Barbara Smith is being assigned one half of Mark Smith's pension entitlement in recognition of the fact that his "employment occurred completely during the course of the marriage." PSA, Art. V. ERISA does not require identification of the pension plan by its specific name. *See Metro. Life Ins. Co. v. Bigelow,* 283 F.3d 436, 444 (2d Cir. 2002). In *Bigelow,* the State-issued judgment identified "a General Electric insurance plan," and this description satisfied the requirements for a QDRO. *See id.* Likewise, in *Wheaton,* the designation "the life insurance which is currently carried through his/her employer" was found to satisfy the requirements for a QDRO because it permitted the identification of the plans to which the State-issued decree applied without significant ambiguity. *Id.,* 42 F.3d at 1084; *see also Metro. Life Ins. Co. v. Fowler,* 922 F.Supp. 8, 14 (E.D.Mich.1996) (finding QDRO based on specification of "any and all life insurance policies ... by virtue of employment"). Here, there is no ambiguity as to the relevant plan, the DuPont Pension and Retirement Plan, and the PSA clearly satisfies 29 U.S.C. § 1056(d)(3)(C)(iv).

In summary, the PSA substantially satisfies all four of the requirements of 29 U.S.C. § 1056(d)(3)(C). The policy behind the enactment of the QDRO exception, as set forth in *Wheaton,* 42 F.3d at 1084, is fulfilled here to the extent that there is no uncertainty regarding the identity of Mark Smith's proper beneficiary under the DuPont Plan.

#### C. WHETHER THE PSA SATISFIES THE REQUIREMENTS OF 29 U.S.C. § 1056(d)(3)(D)

Even though it substantially complies with all of the requirements of 29 U.S.C. § 1056(d)(3)(C), the Smiths' PSA cannot constitute a QDRO if it violates any of the provisions of 29 U.S.C. § 1056(d)(3)(D).[4]

---

4. Because there is no previously-determined

QDRO involved in this case, 29 U.S.C.

### 1. The PSA Does Not Provide Any Benefit Not Otherwise Provided Under the Plan

A domestic relations order can only constitute a QDRO if it "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." 29 U.S.C. § 1056(d)(3)(D)(i). The spousal benefit at issue in this case has been explicitly granted by DuPont. First, Section V of the DuPont Plan grants employees with at least five years of service to the company, such as Mark Smith, "a nonforfeitable right to a deferred pension." *Id.* § V(A)(1). Moreover, Section V(C)(2) of the Plan explicitly provides spousal benefit coverage in the event of the death of either a current employee or a former employee. *See id.* In the case of former employees, this benefit only begins at the earliest age in which the plan participant would have been eligible for retirement, and benefits are reduced according to the actual age of the employee under set mathematical formulas. *Id.* In other words, the spousal benefit available to Barbara Smith was no secret to DuPont. With a little over fifteen years of service, Mark Smith would have been eligible for retirement at fifty. *See* DuPont Plan § V(A)(1). Thus, Barbara Smith shall be entitled to fifty percent of the available spousal benefit, beginning the month following the day that Mark Smith would have celebrated his fiftieth birthday.[5]

### 2. The PSA Does Not Increase Benefits Under the Plan

The United States Court of Appeals for the Third Circuit has explained that "[a] domestic decree that would have the effect of *increasing* the liability of the Plan over what has been provided in the Plan (read in light of federal law) is not a QDRO, no matter what the decree's status under state law." *Samaroo*, 193 F.3d at 189–90 (emphasis added); 29 U.S.C. § 1056(d)(3)(D)(ii).

In *Samaroo*, 193 F.3d 185, the Third Circuit rejected the plaintiff's attempt to obtain benefits pursuant to an amendment to a domestic relations settlement agreement approved by the Superior Court of New Jersey *after* the death of the plaintiff's spouse, the plan participant. This subsequent amendment was obtained because the terms of the unamended settlement agreement did not grant the plaintiff any survivor's benefits under the deceased spouse's pension plan. The Court held the *nunc pro tunc* State court order did not qualify as a QDRO under federal law and affirmed the District Court's holding that entitlement to a survivor's benefit under a pension plan must be determined as of the date of the plan participant's death. *Id.* at 191. Enforcing the amended divorce decree would have resulted in an impermissible increase in plan benefits, in violation of 29 U.S.C. § 1056(d)(3)(D). *Id.* 189–90. One of the main reasons behind this restrictive approach is that "successful operation of a defined benefit plan requires that the plan's liabilities be ascertainable as of particular dates." *Id.* at 190.

Unlike the decree in *Samaroo, supra,* the PSA in this case was executed prior to the death of the plan participant. Thus, the Plan's liabilities were ascertainable as of a particular date prior to Mark Smith's death. Indeed, because the earliest date on which spousal benefits could ever begin

§ 1056(d)(3)(D)(iii) is inapplicable.

**5.** By establishing a predictable, earliest date on which a former employee's spouse can begin receiving benefits, the Plan is able to

ascertain its total liability as of a given date. As discussed *infra,* this is one of the reasons behind ERISA's prohibitions against orders from qualifying as QDRO's that seek additional or increased benefits under a plan.

is tied to Mark Smith's chronological age, and not to the date of his death or change in marital status, the plan's liabilities are ascertainable as of a particular date. This case is distinguishable from *Samaroo* because the PSA here did not increase the Plan's liability—after the Smiths executed their PSA, the liabilities of the DuPont Plan remained unchanged.[6] Thus, the PSA does not violate 29 U.S.C. § 1056(d)(3)(D)(ii).

This case is also distinguishable from *Dickerson v. Dickerson,* 803 F.Supp. 127 (E.D.Tenn.1992), a case relied on heavily by the Defendant. *Dickerson* held that a divorce decree was not a QDRO because, by seeking to require the plan to disburse pension funds prior to the earliest retirement age when the plan participant was eligible to receive funds, it sought a benefit not otherwise permitted under the plan. *Id.* at 134. As in *Samaroo,* the court reasoned that "[i]f the courts were to allow divorce decrees of participants entered many years prior to their normal retirement dates to cause sudden, unanticipated and immediate withdrawals from pension funds, it would be in contravention of the fundamental purpose of ERISA." *Dickerson,* 803 F.Supp. at 133. Here, the Plain-

tiff does not seek early disbursement of funds, and the DuPont Plan Administrator's ability to control the disbursement of Plan funds is not jeopardized.[7]

## D. THE SMITHS' FAILURE TO PROVIDE THE PLAN ADMINISTRATOR WITH A COPY OF THE PSA

▮▮▮▮ DuPont emphasizes that it did not receive a copy of either the Smiths' Judgment of Divorce or PSA. *See* Cauthen Aff. ¶ 11, Def.'s 56.1 Statement, ¶ 20. This, however, does not alter DuPont's obligations under the PSA, which I have concluded qualifies as a QDRO under ERISA's requirements. Although ERISA mandates certain conduct by a plan administrator upon receipt of a domestic relations order, *see* 29 U.S.C. §§ 1056(d)(3)(G)-(H), the statute does not absolutely require the plan administrator's receipt of the order for its qualification as a QDRO, *see Williams v. Williams,* 50 F.Supp.2d 951, 963 (C.D.Cal.1999) ("case law does not suggest that a court is precluded from finding a valid QDRO despite the plan administrator's failure to follow this course").[8]

▮▮▮▮ In summary, as long as the domestic relations order satisfies the require-

---

**6.** The Third Circuit also focused on the fact that Samaroo enjoyed the right to remarry and bestow on a new wife survivorship rights under his retirement plan. "Allowing Samaroo (or his estate) to preserve the right to confer the benefits on a new wife as long as he was alive and had the possibility of remarrying, and then to designate [plaintiff] as the surviving spouse after his death, is allowing him to have his cake and eat it, too." *Samaroo,* 193 F.3d at 191. Mark Smith, the plan participant in this case, consciously ceded fifty percent of those spousal benefits available under the Plan. Thus, he would be unable to bestow more than fifty percent of his plan benefits on a new wife under the terms of the PSA. There are no double bites from the same cake in this situation.

**7.** In fact, Smith's motion is well-timed. According to this Court's calculations, because

Mark Smith left DuPont on October 3, 1988 at the age of thirty-six, *see* Cauthen Aff. ¶¶ 5–6, by now he would have reached the fifty-year minimum age requirement for receipt of pension benefits, making them available to Plaintiff.

**8.** The language of the statute also indicates that receipt of the order by the plan administrator is not mandatory: "In the case of any domestic relations order received by a plan …" 29 U.S.C. § 1056(d)(3)(G)(i). Notwithstanding this permissive language, it would certainly be prudent for parties to submit their domestic relations orders to pension plan administrators as soon as practicable for qualification as QDRO's, so that any ambiguities in the orders could be resolved early on.

ments of 29 U.S.C. §§ 1056(d)(3)(C) and (D), it qualifies as a QDRO and is enforceable, despite ERISA's broad preemption of state laws relating to pension plans. This is the very goal of the Retirement Equity Act, *see* Discussion, *supra,* § III(A), enacted to give effect to divorce decrees and related State-court orders that pertain to ERISA-regulated plans.

## E. ATTORNEY'S FEES AND COSTS

 In an enforcement action brought under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In deciding whether to award attorney's fees under this section, a District Court must consider the following five factors: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir. 1983); *see also Anthuis v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1011–12 (3d Cir.1992).

DuPont has not exhibited bad faith in this case. It rejected Smith's claim for benefits based on a colorable interpretation of the PSA and its own plan documents. Moreover, DuPont did not have the benefit of reviewing the PSA until it received Smith's request for benefits. As for the second *Ursic* factor, DuPont concedes that it has the ability to pay an award of reasonable attorneys' fees. *See* Def.'s Br. in Supp. of Summ. J., at 25. Because the outcome of this case was largely dependent on the language of the PSA and the DuPont Pension Plan documents, there is little reason to believe that an award of attorneys' fees would serve a deterrent effect on other offending parties.

Members of the plan as a whole, likewise, do not necessarily stand to benefit for this reason—plan beneficiaries with similarly-worded PSA's and Judgments of Divorce, however, might benefit from this decision. Finally, the merits of the parties' positions in this ERISA dispute, essentially contractual in nature, are not extraordinary. After balancing the five *Ursic* factors, I find that attorney fee-shifting is not warranted in this case.

## IV. CONCLUSION

The Property Settlement Agreement between Barbara Smith and Mark Smith satisfies the requirements of 29 U.S.C. §§ 1056(d)(3)(C) and (D), and, thus, constitutes a Qualified Domestic Relations Order. The fact that the DuPont Plan Administrator did not receive a copy of the PSA prior to the plan participant's death does not defeat the Plaintiff's entitlement to benefits under the QDRO. I shall order the DuPont Plan Administrator to provide Smith with the benefits due to her pursuant to Section V(C)(2)(d) of the DuPont Pension and Retirement Plan. Accordingly, Plaintiff's motion for summary judgment shall be granted, and Defendant's cross-motion for summary judgment shall be denied. The Court shall enter an appropriate form of Order.

## ORDER

This matter having come before the Court on the crossmotions of Plaintiff, Barbara Smith, and Defendant, DuPont Pension and Retirement Fund, FOR SUMMARY JUDGMENT, pursuant to Fed. R.Civ.P. 56, Darrell Fineman, Esq., CAPIZOLA, FINEMAN & LAPHAM, P.C., appearing on behalf of Plaintiff, and Mark J. Oberstaedt, Esq., and Timothy E. Strauss, Esq., ARCHER & GREINER, P.C., appearing on behalf of Defendant; and,

The Court having considered the submissions of the parties, for the reasons set

forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 19th day of February, 2003, hereby ORDERED that:

(1) Plaintiff's motion to reopen the case is GRANTED;

(2) Plaintiff's motion for summary judgment is GRANTED;

(3) Defendant's cross-motion for summary judgment is DENIED; and,

(4) This action is REMANDED to the DuPont Plan Administrator so that he or she may calculate and disburse to Plaintiff the spousal benefits to which she is entitled, pursuant to Section V(C)(3) of the Plan.