# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 18, 2011

No. 10-20015

Lyle W. Cayce
Clerk

Glenn Brown; Betsy Brown,

Plaintiffs - Appellees

v.

Continental Airlines, Inc.,

Defendant - Appellant

---

The Continental Pilots Retirement Plan Administrative Committee,
Continental Airlines, Inc.,

Plaintiffs - Appellants

v.

Glenn Brown; Betsy Brown; Jay Ellis; Carol Ellis; Eddie Lindsey; Delores N.
Lindsey; Christine Lockert; James Lockert; Douglas Schull; Marjorie Schull;
James Vial; Brenda M. Vial; Cindy Ernst; James Ernst,

Defendants - Appellees

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before JOLLY, DeMOSS, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

No. 10-20015

This appeal involves the question of whether ERISA allows a retirement plan administrator to seek restitution of benefits that were paid to a plan participant's ex-spouse pursuant to a domestic relations order such as a divorce decree, if the administrator subsequently determines that the domestic relations order is based on a "sham" divorce. We agree with the district court's holding that the subsection of ERISA at issue here, 29 U.S.C. § 1056(d)(3)(D)(i), does not authorize an administrator to consider or investigate the subjective intentions or good faith underlying a divorce. We therefore affirm the district court's dismissal of the appellants' claims.

## I. LEGAL BACKGROUND

The Employee Retirement Income and Security Act ("ERISA") contains an anti-alienation provision which requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). This provision is the result of "a considered congressional policy choice, a decision to safeguard a stream of income for pensioners []and their dependents." *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990). However, an exception to the anti-alienation provision allows retirement benefits to be assigned to an "alternate payee," such as an ex-spouse, in accordance with a domestic relations order ("DRO") issued by a court. *See id.* § 1056(d)(3). The statute defines a DRO as follows:

> the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--
>
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
>
> (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii). A DRO allows for the alienation of pension benefits only if the plan administrator determines that the DRO is a "qualified domestic relations order" ("QDRO"), which ERISA defines as follows:

> the term "qualified domestic relations order" means a domestic relations order--
>
> (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
>
> (II) with respect to which the requirements of subparagraphs (C) and (D) are met.

*Id.* § 1056(d)(3)(B)(i). Subparagraphs (C) and (D) require that in order to be qualified, a DRO must clearly specify certain information, and must not require benefits to be paid in a way that would be inconsistent with the plan or with a previous QDRO:

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies--
>
> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
>
> (iii) the number of payments or period to which such order applies, and
>
> (iv) each plan to which such order applies.
>
> (D) A domestic relations order meets the requirements of this subparagraph only if such order--
>
> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

No. 10-20015

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

*Id.* § 1056(d)(3)(C)-(D).  Once an administrator determines that a DRO is qualified, the statute requires that the plan "shall provide for the payment of benefits in accordance with the applicable requirements of" the QDRO.  *Id.* § 1056(d)(3)(A).  The Supreme Court has observed that "[a] QDRO enquiry [by a plan administrator] is relatively discrete, given the specific and objective criteria for a domestic relations order that qualifies as a QDRO, . . . requirements that amount to a statutory checklist working to spare [an administrator] from litigation-fomenting ambiguities."  *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 876 (2009).

## II.  FACTS

In this case, the Continental Pilots Retirement Plan Administrative Committee and Continental Airlines, Inc. (collectively "Continental") filed suit against nine pilots and their spouses,[1] asserting claims for equitable relief under 29 U.S.C. § 1132(a)(3), a provision of ERISA.  Continental seeks restitution of pension benefits that it paid to the spouses on the basis of DROs that, Continental argues, did not meet all the statutory criteria for QDROs because they were based on "sham" divorces.

Continental alleges that the pilots and spouses obtained "sham" divorces for the purpose of obtaining lump sum pension distributions from the Continental Pilots Retirement Plan ("the Plan"), which they otherwise could not have received without the pilots' separating from their employment with

---

[1] Two of those couples have been dismissed from the suit and are not parties to this appeal.

No. 10-20015

Continental.  By getting divorced, the pilots and spouses were able to obtain DROs from state courts, which assigned 100% (or, in one instance, 90%) of the pilots' pension benefits to the spouses.  The Plan provides that, upon divorce, if the pilot is at least 50 years old (as all the pilots in this case were), an ex-spouse to whom pension benefits are assigned can elect to receive those benefits even though the pilot continues to work at Continental.  Thus, the pilots and spouses presented the DROs to Continental and requested the payment of lump-sum pension benefits to the spouses.  After the spouses received the benefits, the couples remarried.

According to Continental, the reason behind this stratagem was that the pilots were worried that financial troubles in the airline industry might result in the Plan being taken over by the federal Pension Benefit Guaranty Corporation ("PBGC"), and this might lead to their receiving less than the full amount of the benefits they expected to receive upon retiring.  Also, a PBGC takeover would prevent the pilots from receiving their benefits as a lump sum instead of an annuity.  Thus, by divorcing and having state courts assign their pension benefits to their spouses, the pilots were able to ensure that they would receive all the benefits owed to them, without having to retire at that time.

The couples' divorces were "sham" divorces, according to Continental, because they did not otherwise intend to dissolve their marriages, they obtained the divorces solely to get the pension benefits, and — as the district court phrased it — they "essentially conducted themselves as if the divorce had never happened."  *Brown v. Continental Airlines, Inc.*, Nos. H-9-1148, H-9-1529, 2009 WL 3365911, *1 (S.D. Tex. Oct. 19, 2009).  "Many of the pilots continued to cohabitate [with their ex-spouses, and] [i]n many instances they did not inform any of their family or friends that they had gotten a divorce."  *Id.*

5

No. 10-20015

After the Plan paid out the benefits and the pilots and spouses remarried, Continental found out about the scheme. It filed suit against the pilots and spouses, seeking relief under 29 U.S.C. § 1132(a)(3), which authorizes a fiduciary to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other equitable relief (i) to redress such violations." Continental sought equitable relief in the form of restitution of the lump sum benefits it had paid to the spouses while they and the pilots were divorced.

The pilots filed a motion to dismiss for failure to state a claim, which the district court granted. The district court held that under § 1056(d)(3), a retirement plan's administrator may not refuse to treat a DRO as a QDRO on the basis that the administrator believes the DRO was not obtained in good faith from the court that issued it. The district court reasoned that "under the plain language of the statute, the Administrator may not refuse to qualify a DRO except based on reasons enumerated in the statute," and that "the motivation or good faith of the divorce and resulting DRO is not an enumerated requirement." *Brown*, 2009 WL 3365911, at *4.

### III. ANALYSIS

"We review a district court's grant of a motion to dismiss for failure to state a claim de novo, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'" *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)). The federal courts do not owe deference to Continental's interpretation of either ERISA or the DROs obtained by the pilots and spouses. *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 611 (5th Cir. 1999) ("A court reviews a plan administrator's statutory and legal conclusions de novo. . . . Likewise, the district court here

did not owe deference to the Disability Plan administrators' interpretation of a domestic relations order, a contract judicially approved by a state court.").

Continental's claims against the pilots and spouses depend on, inter alia, the proposition that a plan administrator has the authority to refuse to deem a DRO to be a QDRO based on its determination that the underlying divorce is a "sham."[2] We reject this assertion, as the district court did, because § 1056(d)(3) requires an administrator to determine that a DRO is a QDRO if it satisfies all the statutory criteria, and the participants' good faith in obtaining a divorce is not among those criteria.

Continental argues that the DROs in this case did not satisfy one of the statutory criteria — that they must "not require [the Plan] to provide any type or form of benefit, or any option, not otherwise provided under the plan," 29 U.S.C. § 1056(d)(3)(D)(i). Under Continental's reasoning, the DROs in this case provided an "option . . . not otherwise provided under the plan" because they enabled the couples to obtain retirement benefits while the pilots were still working at Continental.

There is no question that the Plan generally permitted the ex-spouses of pilots to obtain retirement benefits under DROs while the pilots continued to work. In an ordinary case in which a pilot obtained a divorce, a DRO would be consistent with the Plan (and would satisfy § 1056(d)(3)(D)(i)) even though it allowed the ex-spouse to receive pension benefits while the pilot continued to work. Thus, at bottom, Continental's argument is that the DROs in this case failed to satisfy § 1056(d)(3)(D)(i) not simply because they required the Plan to pay out retirement benefits while the pilots continued to

---

[2] The parties also dispute whether a plan administrator can retroactively determine that a DRO is not qualified, when it has already previously determined that the DRO was qualified and has accordingly paid out benefits. We do not decide this issue.

work, but because the couples in this case did not obtain their divorces in good faith.

We do not accept Continental's broad interpretation of § 1056(d)(3)(D)(i). Continental does not cite any authorities, and we have not found any, which have interpreted the subsection as authorizing an administrator to consider the good faith of the underlying divorce, or any similar question, when determining whether a DRO is qualified. On the contrary, the courts that have interpreted § 1056(d)(3)(D)(i) have understood it as simply allowing an administrator to determine that a DRO is not qualified when it would require benefits to be paid in a specific manner or time frame that is not provided for in the terms of the plan. *See, e.g.*, *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1152 (10th Cir. 2003) ("[B]enefits of a type or form not otherwise provided is best understood as referring to a lump sum payout rather than regular payments over a period of years."); *Fox v. Fox*, 167 F.3d 880, 882-83 (4th Cir. 1999) (considering whether a plan administrator abused his discretion by refusing to qualify a DRO under § 1056(d)(3)(D)(i) on the grounds that the ex-spouse sought two lump-sum payments whereas the plan allowed for only one); *Johnson v. Nanticoke Memorial Hosp., Inc.*, 700 F. Supp. 2d 670, 678-79 (D. Del. 2010) (holding that a divorce order that gave the ex-spouse "the option to seek an annuity or lump sum payment" was a QDRO because it did "not require any option to be added [to the plan] that d[id] not already exist"); *DeFazio v. Hollister, Inc.*, 636 F. Supp. 2d 1045, 1078 (E.D. Cal. 2009) ("The plain language of this provision only bars a QDRO from requiring a plan to affirmatively afford a type or form of benefit not established under that plan."); *Smith v. Estate of Smith*, 248 F. Supp. 2d 348, 358 (D.N.J. 2003) (holding that a property settlement agreement incorporated into a judgment of divorce was a QDRO because the plan specifically granted the type of benefit that was assigned to

the ex-spouse).  If the divorces in this case were indeed shams, that would not mean the spouses received any type or form of benefit, or option, that the Plan did not provide for; rather, they received lump-sum pension benefits, as provided by DROs issued by state courts assigning those benefits to them, at a time when the pilots were at least 50 years old, as permitted by the terms of the Plan.

Our reading of § 1056(d)(3)(D)(i) is in harmony with the reasoning of the Supreme Court, our court, and other federal appellate courts, which have described the determination of whether a DRO is qualified as a straightforward matter that requires the administrator to take DROs at face value and not to engage in complex determinations of underlying motives or intent.  "[A] QDRO enquiry is relatively discrete, given the specific and objective criteria for a domestic relations order that qualifies as a QDRO, *see* §§ 1056(d)(3)(C), (D), requirements that amount to a statutory checklist working to 'spare [an administrator] from litigation-fomenting ambiguities.'" *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 876 (2009) (quoting *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1084 (7th Cir. 1994)).  "ERISA's statutory scheme 'is built around reliance on the face of written plan documents.'" *Id.* (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)).  Thus, in *Kennedy*, the Supreme Court concluded that the "QDRO enquiry" should *not* involve "asking a plan administrator to figure out whether a claimed . . . waiver was knowing and voluntary, . . . and so forth, on into factually complex and subjective determinations."  *Id.*  Similarly, our court has reasoned that "ERISA does not require, or even permit, a pension fund to look beneath the surface of the order.  Compliance with a QDRO is obligatory. . . . This directive would be empty if pension plans could add to the statutory list of requirements for 'qualified' status."  *Matassarin v. Lynch*, 174 F.3d 549, 568 (5th Cir. 1999)

(alteration in original) (quoting *Blue v. UAL Corp.*, 160 F.3d 383, 385 (7th Cir. 1998)) (internal quotation marks omitted).  It would be inconsistent with these cases' approach of eschewing "complex and subjective determinations," *Kennedy*, 129 S. Ct. at 876, for us to permit Continental to seek restitution in federal court based on its determination regarding the subjective motives and intentions of the pilots and spouses when they entered into their divorces.

Continental also frames its argument as an application of the "sham transaction doctrine," under which sham divorces can be disregarded in tax, bankruptcy, and immigration law.  *See Boyter v. C.I.R.*, 668 F.2d 1382 (4th Cir. 1981) (tax); *In re Atkins*, 134 B.R. 936 (B.A.P. 9th Cir. 1992) (bankruptcy); *Matter of Aldecoaotalora*, 18 I. & N. Dec. 430 (B.I.A. 1983) (immigration).  We decline the invitation to incorporate the sham transaction doctrine into § 1056(d)(3).  There is a significant difference between allowing federal tribunals such as the tax, bankruptcy, and immigration courts to consider whether a divorce is a sham, and authorizing a private entity such as Continental to make such a determination, which would involve independently investigating employees' private lives in order to judge the genuineness of the intentions behind their divorces.  Moreover, the Supreme Court has "observed repeatedly that ERISA is a 'comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system.'"  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)).  The Court has "therefore been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text."  *Id.* (alteration in original) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)).  It follows that we ought to be reluctant to extend the sham transaction doctrine from other areas of law into the QDRO context when

No. 10-20015

Congress has not expressly done so.  If, as Continental argues, there are important considerations of public policy that favor allowing plan administrators to apply the sham transaction doctrine in deciding whether to qualify DROs, then Continental should ask Congress to amend the statute.

For the foregoing reasons, we conclude that 29 U.S.C. § 1056(d)(3)(D)(i) does not authorize a plan administrator to determine that an otherwise valid DRO is not a QDRO because it is based on a "sham" divorce.  We therefore AFFIRM the district court's dismissal of Continental's claims for failure to state a claim on which relief can be granted.[3]

---

[3] We emphasize that this holding is a narrow one, and our decision should not be construed to prevent a retirement plan administrator from recouping benefits paid out if a divorce is declared a sham (or a DRO is otherwise invalidated) by a court or agency of competent jurisdiction, and thus the doctrine of res judicata precludes further litigation in an ERISA proceeding on the question of good faith.  That scenario is not before this panel.